IN

# THE SUPREME COURT

OF THE

# STATE OF KANSAS,

AT A SPECIAL TERM HELD AT LEAVENWORTH APRIL, 1866.

---

THOMAS J. CRAFT, *Appellant* v. THE STATE OF KANSAS,
*Appellee.*

### *Criminal Appeal from Leavenworth County.*

An indictment presented Dec. 5th, 1865, signed by the prosecuting attorney as "district attorney," was not for that reason void under the act of Feb. 12th, 1864, creating the office of county attorney and repealing the act creating district attorneys, and *held* that the proviso in the 16th section of the latter act continued in office the district attorneys elected in 1863 until January 1866.

The record showing that the principal witness against the defendant in an action for murder, had been indicted for the same offense, and declared on the witness stand that she was a common prostitute, and was in company with defendant during the whole of the night of the homicide, and that the prosecuting attorney had agreed with her not to prosecute the indictment against her if she told the truth; *Held* that nothing but a plea of guilty or the verdict of a jury would show her to have been an accomplice, but *held* that the indictment against her was admissible in evidence as affecting the weight of her testimony, and that the court erred in rejecting it.

*Semble*, had it been shown that she was an accomplice, it would not have been necessary to a legal conviction that her evidence be corroborated in every material matter.

*Held* that, had the jury believed her a common prostitute, they were not *bound* as a matter of law to reject her testimony.

Murder at common law is "where a person of sound memory and discretion unlawfully kills any reasonable creature in being and in the peace of the

state with malice prepense or aforethought, (*i. e.* with an unlawful intent before the killing, to take life)—either express or implied.'' Deliberation and premeditation in any other sense were not necessary ingredients.

In sections 1 and 2 of the '' Crimes Act,'' [Comp. L., p. 287,] the legislature did not define the word '' murder,'' but used it in this technical common law sense, dividing it into degrees,—that which is deliberately and premeditately done is murder• in the *first,* and all other murders are in the *second* degree.

To determine the degree, it is only necessary to determine whether it was done deliberately and premeditately.

'' Deliberately '' here used means that the manner of the homicide was determined upon after examination and reflection; that the consequences, chances and means were weighed, carefully considered and estimated.

'' Premeditately '' literally means planned, contrived or schemed beforehand.

The instruction given to the jury that '' it is also necessary that the defendant intended to kill the deceased at the time of the homicide, (but if he formed his purpose even while striking the deceased, and after having formed the purpose, continued to strike Gallagher, and such striking resulted in death, then that would be sufficient evidence of intention.) The intention of defendant is to be arrived at by considering how he committed the act charged, with what kind of weapon, under what circumstances, and generally by considering all the facts and circumstances attending the act,'' taken with other instructions given, do not contravene the law, but *semble,* the correct practice is for the court to treat the separate propositions requested by counsel as suggestions, and to embody what is correct and applicable in a succinct charge without repetition.

*Held* that the court in charging a jury '' must state to them all matters of law which are necessary for their information in giving their verdict.'' [Crim. Code sec. 215; Comp. L., p 268]. That as under a charge of murder in the first degree, the defendant may be convicted of any offense necessarily included therein, viz : murder in the second, and manslaughter in the different degrees, it was the duty of the court to explain all to the jury.

When there is testimony upon a question of fact material to the issue, the jury are the exclusive judges of that question and must determine what the testimony proves, but the law requires the court, after the jury have made their findings, to determine whether there is *any* evidence of a particular material fact.

The law does not presume that a homicide was deliberate and premeditated and done with malice, but these facts must be proved by evidence or reasonably inferred from established circumstances, (which may differ in different cases,) and must be found by the jury that their verdict of murder in the first degree may be sustained.

The jury are the judges of the facts and of the inferences, subject only to

the limitation that they must be *reasonable* inferences. There is no distinction in principle between express and implied malice.

The record showing that the defendant and the deceased, personal acquaintances and friends, met accidentally, exchanged a few words, when the homicide occurred, and nothing appearing as to former grudges, threats or planning, it does not justify a finding of premeditation and deliberation, though the manner and immediate circumstances of the killing might justify a finding of malice.

This case arose on an indictment found December 5th, 1865, against this appellant, Craft, and one Henry H. Campbell, jointly, for murder in the first degree, committed in Leavenworth County, Sept. 29th, 1865, in killing Dennis Gallagher. The indictment was signed H. W. Ide, District Attorney, 1st Judicial District. The defendants in the action below on motion obtained an order for separate trials. Craft moved to quash the indictment on the ground among others, substantially, that it was not signed by the proper officer—the county attorney for Leavenworth county. This motion was overruled and exceptions taken, and the defendant then pleaded "not guilty."

Different witnesses were produced by the State whose testimony tended to prove that on the evening of Sept. 29th, 1865, the deceased in his life-time was seen in an auction room in Leavenworth City, and that the defendant Craft was also there; that during the night following between 12 P. M. and 1 A. M., the cry of "Oh! Lord?" "murder," &c., was heard—apparently emanating from "Fleming's saloon" in said city, near the "Military Reserve;" that the next morning was very foggy; that very early on that morning, the body of the deceased was by two men—one at the head and the other at the feet of the body—carried along the "Reserve" and laid by the side of the road; that Molly Brown and Lucy Furguson were with these men at the time; that afterwards the body was taken in an ambulance to the "dead house" at the Fort (Leavenworth,) and there examined by the surgeon,—the face found bruised with wounds penetrating the brain, which caused death.

Molly Brown was called as a witness for the prosecution. Her evidence was objected to on the ground that she had been indicted by the same grand jury who found the indictment in this case, for the same offense. The indictment filed Dec. 6th, 1865, was read to the court. The objection to the introduction of her evidence was overruled, to which the defendant excepted, and the defendant then moved the court to instruct the witness that she need not answer questions tending to criminate herself. This motion was overruled and exceptions preserved. The witness then proceeded to testify as follows :

" I reside in Leavenworth City, Kansas; I know Thos. J. Craft and Henry H. Campbell, and Lu Furguson. I became acquainted with her about two weeks before she was arrested for this murder. Lu Furguson and I left Flora Mitchel's on the night of the murder and went to Fleming's saloon, near by; I had on a light brown dress, shaker trimed with blue, no other outside dress; Lu Furguson had on a light calico dress, shaker like mine; while at the saloon a man by the name of Clark and myself went out on the Reserve towards the river, came back and went to Mrs. Rose's saloon near Fleming's, towards the city on Fifth street, the thoroughfare leading from the city to Fort Leavenworth. One Brooks went to Mrs. Rose's saloon with us, and Alonzo Jay came there with four soldiers. We remained there about an hour; Lu, myself and Fay went with these men to the Siegel Garden, stayed there an hour and a half, came back to the office of the Provost Guard on Shawnee street, Leavenworth; some of the men went there for money. We went thence to Mrs. Rose's saloon; this was about 10 o'clock P. M.; there we saw Messrs. Smith, Hamilton, Clark, Brooks, Craft, (defendant,) and Campbell; we stayed there over an hour, and started for the Fort, north of the city, two miles and over away; I saw defendant Craft at Mrs. Rose's saloon before we left for the Siegel Garden; he wanted me to go to the

Fort to stay with him that night; he had on a white linen coat, white and black straw hat. Lu Furguson, Craft and Campbell and Brooks and myself started from Mrs. Rose's saloon about 11 P. M.; we left a number there drinking; we were all drinking. Brooks and Lu Furguson returned towards the city at the first bridge on the Fort road outside of the city limits; Lu got angry there and would not go further; we, Craft, Campbell and myself, went on towards the Fort; on the last ·bridge towards the Fort we sat down and talked ten minutes; Craft and Campbell wanted to go back and get more whiskey; I went back with them; Craft had a slung-shot with him. On our way back and before we got to the Fremont House on 5th street, on the main road, we met Gallagher, the deceased, a few yards from the Fremont House, which is about one hundred yards from Mrs. Rose's saloon; Gallagher was alone; there was moon-light; Gallagher spoke to Craft; said he would tell Dyer that he (Craft) was walking with his (Dyer's) girl; said "that is played out." Craft and I passed on, went to the Fremont House, rapped several times but did not get in. We then turned back and overtook Gallagher about half-way between the Fremont House and Mrs. Rose's saloon; Gallagher said something to Craft; Craft said "that is played out," and struck Gallagher; Gallagher said he would have revenge; Craft and Campbell then both commenced pounding him; the first blow did not knock him down; the second did; they pounded him on the head when down; he cried aloud "Oh! Lord!" two or three times; they pounded him until he was dead. They consulted about fifteen minutes what to do, and said they had better take him (Gallagher) to the Fort so that some one would find him; they then carried the body towards the Fort; laid it down on the road-side about one hundred yards from the reserve line, on the Reserve; Craft took a white handkerchief out of the pocket of deceased, and put it over the face of the corpse. We then started to the

Fort; it was then foggy; at the last bridge towards the Fort, Craft and Campbell stopped and talked with themselves; Craft and I then went on to the Fort to Craft's room; I saw him take his slung-shot out and lay it down; Craft and I then went to bed. After a while I went to sleep. About day-light I got up; Craft got up first and woke me, and told me I had better get up before the General (Sykes) arose; Craft was the General's servant.— Campbell went from the bridge to his quarters; Craft told me that if I mentioned this affair he would kill me; he made such statement immediately after the killing, and also along the road to the Fort. I was arrested the next day, (Saturday) Sept. 30th. That morning I went straight to Flora Mitchel's; found Lu Furguson; she had just got up and was dressing; as I passed along the road from the Fort to Flora's I saw the dead wagon from the Fort at the place where the dead body was lying.

On cross-examination, witness testified: My occupation is that of an inmate of houses of ill-fame; I make my living that way; have been at the business over six years; I am a "fancy woman"; have kept houses of ill-fame; I make my living at whoring. Craft and I reached the Fort between three and four o'clock A. M., Sept. 30th; I arose at six o'clock; it was day-light when I reached Flora's; the fog had not gone off; the dead body was about one hundred yards from the city line. I know Dyer, have stayed with him often; he stops at the Fort. The prosecuting attorney told me if I would tell the truth he would not prosecute this indictment against me any further.

Here counsel for defendant moved the court to strike out the testimony of this witness on the ground that she was an accomplice in the homicide with Craft. The motion was overruled and exceptions saved.

Dr. Weaver testified among other things that the fatal wound on the face and head appeared to have been made with a blunt instrument. The doctor gave it as his opin-

ion that death was caused more by the concussion than by the wounds. Other wounds on the body and face appeared to have been made by some sharp instrument. Lu Furguson was next called by the State. Her examination was objected to on the same grounds made to that of witness Molly Brown. The indictment against her was read to the court; the motion was disposed of in the same way as that relating to the other testimony named, and the same instructions to the witness asked and refused. This witness by her testimony as far as it went, confirmed the statement of Molly Brown, but she was not present at the killing. She also stated that Craft had been drinking whiskey, but could walk straight; that she heard no cry of murder. She also, on cross-examination stated that she procured her livelihood and made all her money by inhabiting houses of ill-fame and staying with men; that she would be eighteen years old in June, and testified to the same offer on the part of the prosecuting attorney, as was sworn to by the other witness. A similar motion to strike out her testimony was made with the same result as in regard to Molly Brown's evidence.

Other evidence was introduced for the prosecution, and for the defense was introduced evidence tending to impeach Molly Brown and the evidence of Henry H. Campbell,* was introduced, contradicting the statement of Molly Brown as to the striking and homicide, and on other material points.

The following instructions were given by the court below to the jury:

1st. The jury are the exclusive judges of all the facts in the case, and also of the credibility of the witnesses, and may give that weight to the testimony of each and every witness after considering all the facts and circumstances of

*This witness was jointly indicted with Craft for the same offense, and his evidence was introduced without objection. REPORTER.

the case to which in their judgment they think it is entitled.

2d. The jury are to presume the defendant innocent until his guilt is established by the evidence beyond a reasonable doubt.

3d. Before finding the defendant guilty, the jury must believe, from the evidence, that the defendant Craft did kill Dennis Gallagher with malice aforethought, willfully, deliberately and premeditately.

4th. Before finding the defendant guilty, the jury must believe, from the evidence, that the offense was committed within this county, and prior to finding the indictment.

5th. Before finding the defendant guilty, the jury must believe from the evidence, that Gallagher was killed with a slung-shot or some weapon of similar character, or with some weapon unknown, as charged in the indictment.

6th. Before finding the defendant guilty of the crime charged in the indictment, the jury must believe from the evidence, that the killing was done willfully, deliberately, maliciously, and premeditately, with intent to take the life of Gallagher. But to constitute the crime charged, it is not necessary that any given period of time should intervene between the forming of the intent and the commission of the act, it is sufficient if the intent is fully formed before the act is committed.

7th. If the jury believe, from the evidence, that the defendant is not guilty of the crime of murder in the first degree as charged in the indictment, but believe from the evidence that he is guilty of any degree of murder inferior thereto, or any offense, the commission of which is necessarily included in the offense charged in the indictment, they may find defendant guilty of such inferior degree or offense.

8th. If the jury believe, from the evidence, that the witness Molly Brown, was an accomplice in the commission of the crime, before finding the defendant guilty on

58

her testimony, they must believe from the evidence, that she is corroborated in her testimony by some other witnesses, as to some fact or circumstances material to the issue and going to show the defendant's guilt.

9th.  If the jury believe, from the evidence, that any witness knowingly and corruptly testified falsely as to any of the material facts in the case, the jury may disbelieve all of the testimony of such witness.

10th.  The defendant is charged with the crime of murder in the first degree.  This offense, at common law, had no degrees, and was punished with death; but the statute of this state, in its humanity, has divided it into two degrees, and inflicts the penalty of death only on murder in the first degree.  Murder at common law, is where a person of sound memory and discretion unlawfully kills any reasonable creature in being and in the peace of the state with malice prepense or aforethought, either express or implied; but to constitute murder in the first degree under the statute, these elements must not only exist, but in addition thereto it must appear that the homicide was perpetrated willfully, deliberately, and premeditately.  Deliberate and premeditated malice is an essential ingredient of the crime charged.

11th.  Before the jury can convict the defendant, they must be satisfied from the evidence beyond a reasonable doubt,

1. That Dennis Gallagher was killed by some person within this county, prior to the finding of the bill of indictment.

2. That the killing was by a weapon commonly called a slung-shot, or one similar in character, or by some weapon unknown.

3. That he was thus killed by the accused.

12th.  It is also necessary that the defendant intended to kill the deceased at the time of the homicide, (but if he formed this purpose even while striking the deceased, and

after having formed the purpose continued to strike Gallagher, and such striking resulted in death, then that would be sufficient evidence of the intention.) The intention o the defendant is to be arrived at by considering how he committed the act charged, with what kind of weapons, under what circumstances, and generally by considering all the facts and circumstances attending the act.

13th. Every man is presumed to intend the natural and ordinary consequences of his acts, and every man is presumed to be sane.

14th. The credibility of a witness is a question for the jury to decide. The jury may still believe a witness when his or her testimony is corroborated by other evidence, although his or her character has been impeached. The jury are to say what evidence is to be believed, and what is not, after hearing and considering all the testimony in the case.

15th. The jury in this case are the exclusive judges of the facts and credibility of witnesses; and as every killing of a human being is not murder, the jury must find, before they convict this defendant, two propositions:

1 Not only that Dennis Gallagher is dead, but that he was murdered; and

2. That the defendant committed the offenses as charged.

16th. In order to constitute murder in the first degree, a design must be formed to kill willfully; that is of purpose, with the intent that the act by which the life of a party is taken, should have that effect; deliberately,—that is, with cool purpose; maliciously,—that is, with malice aforethought; and with premeditation,—that is, the design must be formed before the act by which the death is produced, is performed. And if any one of the foregoing essentials, viz: malice, intent, and premeditation is not proved, then the defendant is not guilty of murder in the first degree.

17th. The jury have the right to take into considera-

tion the condition of defendant, viz: degree of intoxica-
tion at the time of the commission of the offense charged,
for the purpose of ascertaining whether said offense was
premeditated or not.

18th.   Should the jury find, from the evidence, that the
defendant did willfully and maliciously cause the death of
the deceased, yet before they can find defendant guilty
of murder in the first degree, they must further find that
the killing was done with a formed design to kill, with de-
liberation and premeditation before the mortal blow was
inflicted.

19th.   Malice, in its legal sense, denotes a wrongful act
done intentionally, without just cause or excuse.   Malice
aforethought, (in the language of our statute,) may be ex-
pressed or implied.   Express malice is where one person
kills another with sedate, deliberate mind and formed de-
sign, such formed design being evidenced by external cir-
cumstances discovering the inward intention and premedi_
tation, such as lying in wait, antecedent menaces, former
grudges, and concerted schemes to do the party some bodily
harm.   Implied malice, is where the killing is effected by
any deliberate, premeditated, cruel act, evincing a design
to take human life, and done without present provocation.

20th.   The intention of the defendant, and whether there
was a premeditated design to kill, at or before the time of
the death of Gallagher, may be gathered from the acts of
and declaration of the defendant while engaged in the
commission of the alleged unlawful act; and the jury, in
arriving at such intention, and in determining whether
there was a premeditated killing, may look at all the cir-
cumstances and facts attending the transaction; and if the
jury believe, from all the evidence, considering the condi-
tion of the defendant when he committed the offense, that
said offense was not committed with premeditation, then
the defendant is not guilty of murder in the first degree.

21st.   A few acts, or a multitude of facts proven, all

consistent with the supposition of guilt, are not enough to warrant a verdict of guilty. In order to convict on circumstantial evidence, not only the circumstances must all go to show that the prisoner committed the crime, but they must all be inconsistent with any other rational conclusion—otherwise the jury must acquit.

22d. The defendant is presumed to be innocent until his guilt is satisfactorily proven by legal evidence. The law presumes innocence of the act done, and innocence of the guilty intent. The accused may stand upon the presumption of innocence until every ingredient of the crime is proved, and when there is a reasonable doubt in the minds of the jury as to any of these ingredients having been satisfactorily proven, the jury will acquit the defendant.

23d. It is not every taking of the life of a human being that constitutes murder. The gist of the offense is the intention, and if the jury believe that defendant did not intend to commit an offense, then no offense was committed. Hence the necessity of the jury finding affirmatively all the ingredients stated by our statute, necessary to constitute the offense, as willfully deliberate and premeditated killing, before they can convict; and if the jury find that the prosecution has not satisfactorily proven all these statutory specifications, then they must acquit the defendant.

24th. Although the circumstances of the case may tend to show that defendant committed the offense, yet, if the evidence against the defendant is such that the guilt is not conclusive, or there is a possibility of some other person having committed the offense, and the jury believe, from the evidence, that the prosecution have not shown that defendant had any motive in committing the offense charged, they must acquit the defendant.

25th. That when the testimony of an accomplice in crime is requisite to procure a conviction, unless that testimony is corroborated by other evidence, it is the duty of the jury to acquit the prisoner.

26th. Unless the jury believe from the evidence that the testimony of Molly Brown is fully corroborated by evidence other than that delivered by her, it is their duty to acquit the prisoner if they also believe that Molly Brown was an accomplice in the murder of Gallagher.

27th. Corroboration of the evidence of an accomplice as to immaterial issues, is not sufficient to authorize a conviction upon the otherwise uncorroborated evidence of such accomplice. Before the jury can convict upon the testimony of an accomplice, (or person who stands indicted for the same offense,) that testimony must be corroborated as to the principal and material facts of the case ; and when such material facts in the case are wholly uncorroborated by other evidence, the jury must acquit.

28th. The law presumes the defendant innocent of the offense charged against him in the indictment, and this presumption remains in force, and the jury is bound to act on it, until the State proves his guilt beyond any reasonable doubt.

29th. No presumption arises against the defendant from the proof that a homicide, or the killing of a human being has been perpetrated, until the State has first proved beyond a reasonable doubt, that the defendant is guilty of the killing, in the manner, and at the place charged ; and this law is as applicable to the crime of manslaughter, as to murder in either degree.

30th. That the defendant is entitled to every reasonable doubt, and that neither a mere preponderance of evidence, nor any weight of preponderant evidence, is sufficent for the purpose of conviction, unless it generates full belief of every material allegation in the indictment, to the exclusion of all reasonable doubt; for it is not enough that the evidence goes to show the guilt of the defendant, but the evidence must be inconsistent with any reasonable supposition of his innocence, or the jury will find the defendant not guilty.

The following instructions were asked by the defendant below, and by the court refused :

1st. Before the jury can convict the defendant, they must be satisfied from the evidence that no other person could have or did possess the opportunity possessed by the defendant to commit the act, and must preclude the possibility of any other person having committed the offense.

2d. Before the jury can find defendant guilty of murder in either the first or second degree, they must find, from the evidence,

1st. That express malice or malice aforethought, has been proven, and that such malice existed at the time of the alledged killing, or

2d. That defendant committed the offense in perpetrating or attempting to perpetrate arson, rape, robbery, or burglary.

3d. In civil cases, when the mischief of an erroneous conclusion is not deemed remediless, it is not necessary that the minds of the jurors be freed from all doubt ; it is their duty to decide in favor of the party on whose side the evidence preponderates, and according to the reasonable probability of truth. But in criminal cases, because of the more serious nature of the consequence of a wrong decision, the jurors are required to be satisfied beyond any reasonable doubt, or it is their duty to acquit ; the charge not being proved by that higher degree of evidence which the law demands. In civil cases it is sufficient if the evidence on the whole agrees with and supports the hypothesis which it is adduced to prove, but in criminal cases it must exclude every other hypothesis but that of the guilt of the party.

The jury found the defendant guilty of murder in the first degree. A motion was made to arrest the judgment and also for a new trial, which motions were overruled and proper exceptions saved. The defendant was then sentenced to be hung on the 16th day of March following.

The assignments of error are as follows:

1st.  The verdict of the jury is contrary to evidence.

2d.  The verdict of the jury is against the law applicable to the facts proven.

3d.  The court erred in the charge to the jury.

4th.  The court erred in refusing to charge the jury as requested by said Craft.

5th.  The court erred in not instructing the jury upon the law pertaining to the various degrees of crime of which the said Craft might have been found guilty under the indictment.

6th.  The court erred in overruling the motion for a new trial, and motion in arrest of judgment.

7th.  The court erred in overruling the motion to quash the indictment. 1864, *Laws of Kansas, chap.* 31, *p.* 58; *sec.* 84 *Crim. Code Proc.*, 250; *Teas* v. *State,* 7 *Umph.*, 174; *U. S. Crim. Dig.*, 353, *sec.* 281; *Id.*, 269, *sec.* 53.

8th.  The court erred in overruling motion of defendant to strike out the evidence of Molly Brown and Lu Furguson.

9th.  The court erred in not allowing witness Armstrong to state under what circumstances Molly Brown could be believed.

10th.  The court erred in reinstructing the jury after they had retired to deliberate upon their verdict.

*H. D. Mackay* and *Wm. G. Mathias*, for appellant.

*H. W. Ide, County Attorney*, for appellee.

*Mackay & Mathias* submitted:

1st.  The verdict of the jury is against the evidence. The only evidence, either direct or circumstantial, which connects the plaintiff in error with the commission of the offense charged, is the uncorroborated evidence of an accomplice. No conviction can be had upon the evidence of an accomplice, unless such evidence is cor-

corroborated in some material matter. There being none, the evidence was not sufficient to warrant a conviction. 2 *Russ on Crimes, pp.* 957, 959, 960, 961, 962-3-4-5-6-7; *Ray* v. *State of Iowa*, 1 *Green*, 316; 1 *Grl. Ev. sec.* 380-1; 1 *Arch. on C. Pr. and Pl.*, 154; 3 *Gr. & Wat. on New T.*, 1215; *John* v. *State of Iowa, Green.*, 65; *Com.* v. *Boswick*, 22 *Pick.*, 399; 8 *Am. Law Reg., No.* 1 *p.* 13, 14, note 6; *U. S.* v. *Traux*, 3 *McLean*, 224; 1 *Phil. Ev., p.* 31, 32; *Allen* v. *State of Ohio*, 10 *O. St.*, 287; *Comp. L. Ch.*, 32, *sec.* 258; 5 *Ohio R.*, 245, 247.

There was no evidence tending to show that defendant killed the deceased by means of poison, or lying in wait, or by any other kind of wilful, deliberate, or premeditated means; or in perpetrating or attempting to perpetrate any arson, rape, burglary, or other felony. In order to warrant a conviction of murder in the first degree, the evidence must show that the killing was done by the means, or in the manner above specified. There being no such evidence, the verdict is against evidence in this particular. *Comp. L.*, 287, *secs.* 1, 2; *Shoemaker* v. *State*, 12 *Ohio*, 43; *State* v. *Gardiner*, 12 *Id.*, 400-1; *Clark* v. *State*, 12 *Id.*, 483, 494.

In a criminal case the court will presume all the evidence has been set out in the bill of exceptions when such is the fair construction of it, though it is not said in so many words. Thus is distinguished the practice in criminal from that in civil cases. *Studman* v. *State*, 11 *Ohio Rep.*, 82, 89; *Eastman* v. *Wright*, 4 *Ohio St. Rep.*, 156.

2d. The verdict is against the law applicable to the facts proven. The facts contemplated in the definition of murder in the first degree, (Crimes & Pun., Act Comp. L., 287, sec. 1,) were not proved. In murder of the first degree, express malice must be shown; also premeditation and deliberation; or that the offense was committed by some act, in the commission of which the law implies deliberation, premeditation and malice, or poisoning, lying in

wait, &c.  There being no such state of facts proven, the verdict is against law.  *Maher* v. *The People*, 10 *Mich.*, 210; 3 *Greenl. Ev.*, 29; *Hall* v. *State*, 8 *Ind.*, 439; *Sumner* v. *The State*, 5 *Black*, 579; *State* v. *Merrick*, 19 *Maine*, 398; *Jones* v. *The People*, 12 *Ill.*, 259; *Com.* v. *York*, 8 *Met.*. 93; *Com.* v. *Hawkins*, 3 *Gray*, 463; *Short* v. *State*, 7 *Yerger*, 510; *McDaniels* v. *The State*, 8 *S. & Marsh*, 401; 1 *Lead. Crim. Cas.*, 347, *and notes*; 2 *Id.*, 504, *and notes*; *People* v. *Enoch*, 13 *Wend.*, 159; *White Case*, 24 *Id.*, 558-69-81; *People* v. *Potter*, 5 *Mich.*, 1.

Admitting that the evidence of the accomplice Molly Brown is true, or that her evidence has been sufficiently corroborated to induce belief in her statements, such evidence, shows no malice, no deliberation, no premeditation, no lying in wait, which the law declares must be shown before there can be a conviction of murder in the first degree.  *Comp. L. Ch.*, 35, *secs.* 1, 2, 3, 11, 13, 21.

3d.  The court erred in charging the jury; that, "Before finding the defendant guilty of the crimes charged in the indictment, you must believe from the evidence that the killing was done willfully, deliberately, maliciously and premeditately, with intent to take the life of deceased.  But to constitute the crime charged it is not necessary that any given period of time should intervene between the forming of the intent and the commission of the act; it is sufficient if the intent is formed before the act is committed."

The court assumes in the above instructions that the deceased was killed by Craft, which is a fact for the jury to find; virtually saying to the jury that the only fact for them to find is, whether Craft is guilty in the degree charged, (first degree.)  This construction is apparent from the wording of this charge.  *See State of Kansas* v. *Carle Horne*, 1 *Kan. R.*, 42.

In the same charge the court committed the further error in charging the jury that, to constitute the crime

charged, (murder in the first degree,) it is not necessary that any given period of time should intervene between the forming the intent and the commission of the act.

The statute of the state of Kansas declares, that to constitute murder in the first degree, which is the offense charged, there must be deliberation, premeditation, malice, and the act must have been done willfully. There can be no premeditation or deliberation, without some period of time intervening. The statute wisely makes provision for the frailties of human nature by declaring, that " every murder which shall be committed purposely and maliciously, but without deliberation and premeditation shall be deemed murder in the second degree." *Comp. L., chap.* 33, *sec.* 2.

The charges of the court would more justly come under this statute, but the expression " crime charged," used by the judge, meant, and was understood by the jury, mur- in the first degree. There must be time for reflection, for the passion to cool, to constitute murder in the first degree. 8 *Amer. Law, No.* 10, *p.* 624.

The intention was a question for the jury, and if from the evidence they should find that when the plaintiff in error and deceased first joined in the affray the plaintiff did not intend to kill deceased, but that such intention was an after thought, and the result of heated passion brought about by the conflict, then the offense would not be murder in the first degree. 8 *Amer. L. Reg., No.* 10, *p.* 624.

4th. The court erred in instructing the jury, that " It is also necessary that the defendant intended to kill the deceased at the time of the homicide, but if he formed this purpose even while striking the deceased, and after hav- ing formed the purpose continued to strike Gallagher, and such striking resulted in death, then that would be suffi- cient evidence of intention. The intention of the defend- ant is to be arrived at by considering how he committed the act charged, with what kind of weapon, under what

circumstances, and generally by considering all the facts and circumstances attending the act."

This instruction leads the jury to believe that it is sufficient to constitute murder in the first degree, that the plaintiff in error formed the purpose even while striking the deceased, and after having formed the purpose, continued to strike Gallagher, which striking resulted in his death.

It is virtually instructing the jury that although there was no deliberation and premeditation, and although when the defendant assaulted the deceased, he did not intend to kill him, yet if after he did assault him and while in the heat of passion occasioned by the encounter, he formed the intent, and there purposely killed him, it is sufficient evidence of an intent to find the defendant guilty of the offense charged, (murder in the first degree.) Such an instruction might possibly apply upon a charge of murder in the second degree, but is error when given in reference to the "crime charged." There can be no legal conviction of murder in the first degree, unless the evidence shows premeditation and deliberation. *See Comp. L.*, *chap.* 32.

The error is not cured by the remainder of the same instruction, or any other, containing the law, for it is impossible to say what instruction or portion thereof may have controlled the jury. *State* v. *Carl Horne*, 1 *Kans.*, 42; *State* v. *Sumner*, 5 *Black.*, 519.

If the court gives instructions to the jury which though true as abstract propositions are erroneous when applied to the evidence and may have misled the jury, the verdict will be set aside. *Hopkins* v. *Fowler*, 39 *Maine*, 568; *Chandler* v. *Fulton*, 10 *Texas*, 2; *Thatcher* v. *Jones*, 31 *Maine*, 528; *James* v. *Langdon*, 73 *Newark*, 193; *White* v. *Thomas*, 12 *Ohio S. R.*, 312; *State* v. *Horne*, 1 *Kans.* 42; *Wilson* v. *Rastoll*, 4 *Tenn. R.*, 753; *Boyden* v. *Moore*, 5 *Mass.*, 365.

If the blow which occasioned the death, was purposely

and maliciously given by the prisoner without deliberation or premeditation, or preconceived design, or was an act upon which his mind had not previously resolved, our law defines the offense, "murder in the second degree." *See Statutes of Kansas*; *State* v. *Thompson*, 12 *Ohio*, 924; *State* v. *Williams, Id.*, 198; *State* v. *Montgomery*, 11 *Id.*, 426, *Sullivan* v. *People*, 1 *Parker*, 352; 1 *Russ on Crimes*, 585, 587, 588; 8 *Amer. L. Reg. No.* 10, 620, 623.

5th. The court erred in refusing the first charge to the jury requested by plaintiff in error. *State* v. *Horne*, 1 *Kans.*, 42; *Burrill Circt.* 20, 369, 370, 371, 549; *Roscoe's Crim. Ev.*, 697; *Hodges' Case*, 2 *Leev. C. C.*, 227.

The court erred in refusing to give the second instruction asked. This offense not having been committed while the plaintiff in error was attempting to perpetrate any crime, as stated in the second clause of said instruction, it only becomes necessary to inquire if the first clause of said instruction was applicable or relevant to the case, and should have been given. It is clear from the evidence, that before the defendant could have been found guilty of the " crime charged," (murder in the first degree,) express malice must have been proven, for no such state of facts was shown as would warrant the jury in finding implied malice, as poisoning or lying in wait, &c. Also, it should have been given in relation to murder in the second degree, malice being an essential of that crime, as well as murder in the first degree, and all the essential ingredients of the crime must be proven. *State* v. *Horne*, 1 *Kans. R.*, 42; *U. S.* v. *Henry McClare*, 7 *Bost. L. R.*, 439; *Coffee* v. *State*, 3 *Yerg.*, 283; *See dissenting opinion of Wild in Commonwealth* v. *York*, 9 *Met.*, 93; *People* v. *Potter*, 5 *Mich.*, 1; *State* v. *Latham*, 13 *Iredell*, 33; *Rex* v. *Pearce*, 1 *Leach*, *C. C.*, 544; *State* v. *Pierce*, 7 *Alabama*, 728; *State* v. *Robinson*, 3 *Dev. & Bat.*, 130; *Amer. Cr. L.*, 930; *Com.* v. *Howkins*, 3 *Gray*, 460; 1 *Russ on Crimes*, 482, 483, 579, 587, 685, 6; *Kilpatrick* v. *People*, 5 *Denio*, 277; *State* v. *Shellady*, 8 *Iowa*, 477.

If there was any evidence before the jury which would make the finding of malice essential, then the instruction should have been given. *De Camp* v. *M. & M. R. R. Co.*, 12 *Iowa*, (*Withrow*) *R.*, 348.

The court erred in not giving the whole of the third instruction asked and refused. *See Kans. Code of Cr. Proc.*, sec. 207, chap. 32; *State of Iowa* v. *Shellady*, 8 *Iowa Rep.*, (*Clarke*) 11*th instr. on p.* 497.

6th. The court erred in not instructing the jury upon the law pertaining to the different degrees of crime of which the plaintiff in error might have been found guilty under indictment.

*a.* The instruction given by the court upon this point was insufficient. The Code of Kansas "Criminal Proceedure, (secs. 206, 207, 215, chap. 32,) clearly defines the duty of the court in this particular.

Sec. 206, declares "the court must then charge the jury."

Sec. 207. "Where there is a reasonable doubt in which of two or more degrees of an offense he is guilty, he may be convicted of the lowest degree only."

Sec. 215, "In charging the jury, he must state to them all matters of law which are necessary for their information, in giving their verdict." No request of the prosecuting attorney that he only wants instruction as to the first degree given to the jury, nor the omission of the defendant to request the court to thus instruct can change the duty of the court in this particular. It is a duty which the statute makes obligatory, and a right which the defendant has, to have the court instruct the jury upon the statutory law in reference to the various degrees of murder.

If as declared in section 206, the court must instruct the jury, and as declared in section 215, the court must state to them all matters of law which are necessary for their information in giving their verdict, and section 207 making it obligatory upon the jury to "convict of the low-

est degree only" where they have a doubt as to the degree of the crime, shows conclusively that it is as much the duty of the court to charge the jury all the law pertaining to the various degrees of crime included in the "crime charged," as to instruct in relation to the "crime charged." If it was "necessary for the information of the jury that the court instruct them in relation to the "crimes charged," it was also necessary that he should instruct them in relation to the degree of crime included in the crime charged. If it would have been error in the court omitting to instruct the jury upon the crime charged, then it was also error in omitting to instruct upon the law pertaining to the degrees included therein. 8 (*No.* 10) *Amer. Law Reg.*, 614, 609, 620; *Crim. Code of Kans.*, secs. 207, 205, 218.

*b.* It is well settled that the jury must find what degree of offense the defendant has committed. Unless they are instructed upon the law of the different degrees of offense how are they intelligibly to find the degree. *See opinion in State* v. *Diek,* 3 *Ohio St.* 89; *State* v. *Park,* 3 *Ohio St.* 101; *Roy v. State,* 2 *Kans.,* 409; 5 *Mich.,* 8; 1 *Arch. Cr. Pr.,* 178; 13 *Wend.,* 164-5; 6 *Mass.,* 459.

*c.* This is still more apparent upon reference to section 218 of the Criminal Code of Kansas, which makes it the duty of the jury to specify in their verdict the degree of the offense of which they find the defendant guilty. Is it not then in the words of the statute "necessary for their information in giving their verdict," to know the law pertaining to the various degrees of offense of which the defendant may be found guilty under the indictment? *State* v. *Floyd,* 6 *Jones,* (*N. C.*) 392; *Huich* v. *State,* 25 *Geo.,* 699; *Payne* v. *Com.,* 1 *Mel.* (*Ky.*) 370; *Waters* v. *Bristol,* 26 *Conn.,* 398; *Rite* v. *Corme,* 18 *B. Mon.,* 35; *Higgins* v. *Lee,* 16 *Ill.,* 495; *Crim. Code of Kans.,* secs. 215, 218, 207, 296.

7th. The court erred in overruling the motion for a new trial, and arrest of judgment.

*a.* All points raised upon the motion in arrest can be raised under this head.   *Coleman* v. *Edward*, 5 *Ohio S.*, 51.

*b.* The only evidence tending to show that defendant committed the offense charged, was that of Molly Brown, an accomplice, who was also impeached upon the trial, and whose own testimony showed hér to be an abandoned prostitute, infamous and not worthy of belief, and whose evidence was given under a promise of pardon.   2 *Rus Cr.*, 957.

No conviction of murder should be had upon the testimony of a witness who has been impeached, and whose character is morally bad, and withall an accomplice.   *See Infra No.* 1; *also Comw.* v. *Stephen Murphy*, 14 *Mass.*, 387-8; *Allen* v. *Young*, 6 *Monroe*, 135; *Dunlap* v. *Patterson*, 5 *Cow. Rep.* 243, 246; *Newel* v. *Wright*, 8 *Id.*, 323, 324, 319; *The Santissima Trindad*, 7 *Wheat*, 283, 338-9; 3 *Graham & Wat., New Trial*, 990-1, 1214, 1215, *and notes*; *Slopper* v. *State*, 15 *Ohio St.* 55-6-7.

*c.* It should appear to be morally certain that erroneous instructions have not been injurious, before the party aggrieved can be deprived of a new trial.   *Thatcher* v. *Jones*, 31 *Maine*, 528.

A new trial will be granted for a misdirection of the judge who tried the cause, although in the opinion of the Appellate Court the verdict was right on both the law and the evidence.   *James* v. *Langdon*, 7 *B. Mon.*, 193.

If the direction of the judge who tried the cause, though in terms correct, might still have been misunderstood by the jury, a new trial should have been granted.   *White* v. *Thomas, Ohio St. Rep.*, 312.

*H. W. Ide*, for the State, submitted:

1st.   The objection that the indictment was not signed by the proper officer, is untennable.   The office of district attorney was continued by section 16, act Feb. 12th, '64, Laws '64, p. 58-9, 60-1-2.

2d. Were Molly Brown and Lu Furguson competent witnesses for the State, conceding they stood indicted for the same offense as the appellant? If they were accomplices, that was a fact to be developed by the testimony, and would only go to their credibility.

The mere fact that a person, not a party to the record, is indicted, does not affect his competency. *Wharton sec.* 763 1 *Greenl. on Ev.*, secs. 375, 379; *Comp. L., sec.* 188, *p.* 264, *and sec.* 320, *p.* 176.

3d. Did the court err in declining to advise the witness Molly Brown that she need not state anything which might tend to criminate her? The witness could answer or not, as she pleased. The privilege was a personal one, and she could claim it or waive it, and the refusal of the court to notify her of this privilege, could in no way affect the defendant. It was purely a matter between the court and the witness.

4th. The court properly refused to strike out the testimony of the witnesses Brown and Ferguson. If the evidence showed them to be accomplices with the defendant, that fact would affect their credibility, but not their competency. *Whart., sec.* 783; 1 *Greenl. on Ev., sec.* 379.

5th. Did the court err in giving the instructions? As to the instructions given, the assignments of error are too vague and general, and therefore should not be regarded by this court. They are in bulk to all the instructions given and refused by the court, without specifying what particular ones are claimed to be bad and what are not, leaving counsel and the court to discover the error, if possibly they may, by a blind search into a voluminous bill of exceptions. Where the exception is general—to the instructions as an entirety, it should be overruled if any one is found to be good. 5 *Pet. R.*, 199; 5 *Den. R.*, 218; *U. S. D., vol.* 10, *p.* 71, *sec.* 30; *State* v. *Sater*, 8 *Iowa*, 425; 2 *Kans.*, 226, 337; 15 *Wis.*, 256; 16 *Id.*, 273; 18 *Id.*, 528,

552; 5 *N. Y.*, 427; 7 *Id.*, 266; 18 *Id.*, 558; 20 *Id.*, 34; 6 *Id.*, 233; 11 *Id.*, 416; 8 *Ind.*, 493; 9 *Id.*, 571.

6th. We claim the 12th instruction to be law, founded in reason, principle and policy. It is not a statement that murder in the first degree may be committed without express malice, although if it were, we should still claim it to be amply sustained by authority (1 Kans., 45, 71), but a statement recognizing the principle that a man may commit murder in the first degree, although the intent to kill is not formed until after the assault is begun. The court will bear in mind that this portion of the instruction is only treating of the single element of intent, and not of all the elements constituting the crime charged. As to how this intent must be carried out—deliberately and premeditately—had already been stated to the jury. See Nos. 3, 6 and 10.

*a.* It concedes that the intent to kill must precede the fatal act, but makes that intent, as it should be, the true criterion of crime. The mere fact that a party at the time of forming the purpose to kill, is engaged in a quarrel with the deceased, or is making an unprovoked assault upon him ought not, in law, to shield him or mitigate his guilt. To be sure, if the purpose to kill is the mere offspring of heated blood and passion, and is carried out before the blood has time to cool, the offense might not be murder in the first degree, but it does not follow, by any means, that every purpose to kill formed during an altercation or unprovoked assault, is the mere offspring of heated blood and passion. Many persons are the coolest and most self-possessed at such times.

*b.* All the authorities agree that the intention to kill, need not be formed for any stated or considerable period prior to the fatal act; a moment is sufficient. The principle here contended for, is fully recognized and stated by Rush, president, in the case of the Commonwealth *v.* Dougherty, cited in 1 Russell on Crimes, edition of 1853, p. 482.

*c.* It would be dangerous to establish the principle that a man shall not be convicted of murder in the first degree, unless the evidence shows he formed the purpose to kill before he commenced his assault upon his victim, for that would be to require the State to prove more than the mere killing and the circumstances attending it. It would require it to prove previous threats, menaces, grudges, or concerted schemes to do great bodily harm. It is well known that the most dangerous criminals are those who carefully conceal their designs until the very moment of executing them; nothing can be proved against them showing any intent to kill as existing prior to the actual killing. They have reduced murder to a science; made it one of the fine arts, and have no compunctions of conscience that hold them back from at once committing the offense after the design to take life is formed. Macbeth could commit his second murder with but little hesitation, but he could murder Duncan only after the keenest pangs of conscience, though impelled by high ambition and taunted with cowardice.

*d.* He who having formed the purpose to take human life, swiftly executes that purpose, seizes the present opportunity, makes assurance doubly sure and takes a bond of fate, is as guilty, as well in law as ethics, as the man who delays his purpose, or by brooding over it, becomes a monomaniac, the mere instrument of despotic will, and is much more dangerous to community. *Whart.*, *sec.* 1103; *Com.* v. *Smith*, 1 *Russ. on Crimes*, *p.* 482, *note*; *Whitford's case* there referred to; *State* v. *Johnson*, 8 *Iowa*, 529-30; *Keenan* v. *Com.* *(Penn.)* *Legal Jour.*, *July* 1863; 6 *Blackf.*, 309-10-11; 3 *Selden*, 393-4.

7th. Did the court err in refusing to instruct as requested by the defendant.

*a.* As to the first, there is scarcely any fact or case depending upon human testimony in which there is not a possibility for doubt. The first part of the instruction, if

proper at all, relates more properly to cases where the evidence is circumstantial, and there is no direct testimony connecting the accused with the killing. Here the testimony was positive and direct. The latter part is not now and never has been law. It makes any possible doubt sufficient to acquit, whether that doubt be a reasonable one or not. But the substance of this instruction, is contained in No. 24, which the court gave. *Horne* v. *State*, 1 *Kans.* 44, 71.

*b.* As to the second, the court had already given the correct law to the jury. (See Nos. 3, 10, 16, 18, 19, 20,) and therefore there was no necessity for this instruction, conceding it to be valid and proper. Withholding it from the jury after they had been instructed with reasonable clearness and fullness upon the questions involved in it, certainly could not affect the merits of the action. *Sec.* 276, *p.* 276, *Comp. Laws.*

But this instruction is bad because it requires the jury to find that malice aforethought has been proven by the evidence before they can convict of murder in the second degree.

It is also bad because it authorizes a conviction upon proof that the killing was done while perpetrating or attempting to perpetrate arson, rape, robbery or burglary. We take it a conviction upon the indictment in this cause, could not be sustained by that sort of proof—it would be a case of fatal variance. To be convicted of murder committed while perpetrating any of these felonies, the party must be specially charged with committing the homicide while perpetrating or attempting to perpetrate some one of these felonies.

*c.* As to the third, this contains no correct principle not already given by the court, and as a whole, is bad, because it makes a hypothesis of the guilt of some other person, though not a reasonable one, sufficient to acquit the defendant. If the word reasonable were inserted before the word

hypothesis, it would be good. But the substance of this instruction was given by the court in the 30th instruction, so the accused suffered no injury.

8th. It was claimed below, that the court erred in not instructing the jury more fully as to murder in the second degree and the various degrees of manslaughter. (See No. 7.) If the defendant desired instructions as to issues not immediately before the court, it was his duty to ask them, and failing to do this, he cannot complain. *U. S. Dig.*, *p.* 415, sec. 117; *State* v. *Johnson*, 8 *Iowa*, 531-2.

If the court gave the proper law as to the offense of which the defendant was convicted, then there was no error, and he was properly found guilty.

*By the Court*, Crozier, C. J.

The first reason urged for a reversal of the judgment below in this cause is, that the indictment was not signed by the proper officer. It was signed " H. W. Ide, District Attorney, First Judicial District;" and it is claimed that on the 5th of Dec. 1865, the day the indictment was presented and filed, no such officer was known to the law. On the 12th day of Feb. 1864, an act was passed creating the office of county attorney, and repealing the former act creating the office of district attorney. The repealing act contains this section:

Sec. 16. That the act entitled " An act providing for the election of district attorneys, and defining their duties," approved June 4th, 1861, and also sections 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66 and 67 of an act entitled " An act relating to counties and county officers," approved Feb. 25th, 1860, be and the same are hereby repealed; *Provided*, That all district attorneys in office at the time of the passage of this act shall continue in office for the same term for which they were elected, and shall have the same fees as heretofore provided by law.

The duties imposed upon the county attorney were iden-

tical with those required of the district attorney, except that the functions of the former are confined to one county, while those of the latter extended to all the counties in a judicial district. The district attorneys were to be elected at the November election in 1863, and to hold their offices for two years from the succeeding January. The county attorneys were elected at the November election in 1864, and were to hold their offices for two years from January following.

The effect of the provision above quoted, was to continue the office of district attorney, as to those who held it at the date of the passage of the repealing act, until the expiration of their terms of office, which would occur in January 1866. It is not denied that Mr. Ide was the district attorney at the date referred to, nor is it contended that he resigned before the expiration of his term of office; consequently he was district attorney at the time the indictment was filed; and, therefore, it was properly signed.

Upon the trial of the cause the principal witness against the defendant was one Molly Brown, who upon the stand declared herself to be a common prostitute, and testified that she was present at the alleged homicide, and was in company with the defendant during the whole of the night upon which it was perpetrated. She also testified that the district attorney had agreed with her not to prosecute an indictment then pending against herself for the same crime if she would tell the truth. The defendant sought to read that indictment in evidence, but it was excluded by the court.

It is contended by the defendant that had the indictment been read in evidence, the court would have been bound to charge the jury that they could not convict the defendant upon her testimony unless corroborated in every material matter. The claim is, that it would have affected her credibility in two aspects, to-wit: It would have shown her to have been an accomplice in the homicide, and would

have operated as a bias in view of the promise of the district attorney. That it could legally have the former effect cannot, certainly, be successfully maintained. Every presumption, so far as she was concerned, was against its truth. Nothing but a plea of guilty or the verdict of a jury could, in legal contemplation, establish its truth. It would have evidenced no fact except that she stood charged with the commission of the same crime for which the defendant was being tried. It would have no weight in showing her to have been an accomplice, and consequently was not admissible on that ground.

But upon the other ground mentioned it was admissible. The facts of being charged with the crime under investigation, and having been promised a discharge if she would tell the truth, might very well operate as a bias. The district attorney must have supposed the defendant guilty, and that she knew it. It cannot be presumed that he would offer her a discharge for speaking the truth, if he supposed what she would say would exculpate the defendant. It must have been understood between them what he would consider the truth. She had doubtless detailed to him what her testimony would be, or might be, which probably convinced him of the defendant's guilt; and as an inducement to her to so testify, agreed to release her. She had good reason to expect a discharge upon the conviction of the defendant, which would be a consideration bearing directly upon her credibility. Wherefore, the court erred in excluding the indictment.

But even if it had been shown that she was an accomplice, it would not have been necessary to a legal conviction of the defendant that she be corroborated in every material matter. If such were the law, why adduce her testimony at all? If the remaining testimony must be sufficient without it, her examination would be a useless waste of time and energy. Why swear her at all in the case? Her testimony must go to the jury like that of any

other witness, they being the exclusive judges of her credibility, to give to it what weight, under all the circumstances, it might be entitled to.

Again, it is said that if the jury were convinced from the evidence that she was a common prostitute, they were bound, as a matter of law, to reject her testimony, i. e. the law presumes that when a woman loses her virtue she will not tell the truth. This would be a very harsh rule, unsupported by authority except in one state of the Union, and entirely indefensible by any process of reasoning that this court can conceive of. A woman's chastity should be the "immediate jewel of her soul," and, with reference to consequences to herself, the very last virtue she would be willing to surrender; but when it is considered that she is regarded as the weaker vessel, that she is of a softer nature, of a more yielding disposition and more vulnerable through the affections than we are, it ought not to be said when, in the warmth of sexual excitement and in the glow of natural passion, produced by the soft whisperings, the fervid protestations, the gentle pressures and other kindred blandishments which may be imagined, she submits to the embraces of her lascivious lover, that she pours out from her heart at Venus' shrine with her virtue every other good quality with which, in our thoughts, we endow her sex. Yet the position assumed must come to that. If, as a matter of law, her testimony must be rejected when her virtue is lost, the principle will be the same whether she habitually flaunts her frailty in the face of the world, or attempts to hide it in retiracy, or garnish it with garlands of good works. The conviction and execution of an individual upon the testimony of an abandoned woman, or of a profligate man, would be productive of melancholy reflections, but there is no rule of reason which would not apply with equal force to the credibility of either. Yet it is claimed that the jury would be bound in law to reject the testimony of the former and consider the testimony of

the latter. The law is certainly not so unreasonable. It much more wisely requires that the jury shall consider the statements of either, in the light of surrounding circumstances and the character of the witness, and give them such credence as they deserve.

Another reason assigned for reversing the judgment is, that the jury was improperly instructed as to the law of murder. This involves an examination and construction of the statute of the state upon that subject.

Section one of the Crimes Act provides that "Every murder which shall be committed by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration or attempt to perpetrate any arson, rape, robbery, burglary, or other felony, shall be deemed murder in the first degree."

The second section provides that, "Every murder which shall be committed purposely and maliciously, but without deliberation and premeditation, shall be deemed murder in the second degree."

The word "murder" is used in both sections in a technical sense, i. e., the common law sense. to-wit: "Where a person of sound memory and discretion unlawfully kills any reasonable creature in being, and in the peace of the state, with malice prepense or aforethought, either express or implied."

Under these statutory provisions, reference being had to the foregoing definition for the signification of the word "murder," it would seem there ought to be bu little diffi culty in determining what constitutes murder in the first degree; yet in attempts to bring within, or exclude from the operations of the statute, individual cases depending upon particular states of fact, there has grown up such a mass of irreconcilable judicial disquisition, that it is utterly impossible to deduce therefrom what the intention of the lawmaker was. This court will not attempt to reconcile

these contradictions, but will avail itself of its privilege and seek in the plain terms of the statute itself, the law of murder.

It is very manifest that the legislature did not attempt to define the crimes of murder, either in the first or second degree. The statute says every murder, not every killing, but every murder which shall be perpetrated with or without deliberation or premeditation, shall, as the case may be, be murder in the first or second degree. In either case it must be murder in the meaning of that term as defined above. To constitute murder at common law, there must be malice prepense or aforethought, i. e., an unlawful intention to take life must precede the killing. But "deliberation and premeditation" were not necessary ingredients. The same penalty was provided for killing with malice aforethought that was inflicted for malicious, deliberate and premeditated killing. The law recognized no degrees of atrocity in the commission of the crime. The lawmakers of this state, as did those of other states, thought they ought to recognize some difference in the degrees of malignity with which the killing was done; and upon that basis they undertook to divide murder at common law into two degrees, so that the punishment might to some extent be proportioned to the moral depravity manifested in the commission of the crime.

. Now where is the boundary between the two degrees, contemplated by the statute? In this behalf, it must be remembered that the question is not what shall constitute murder. That question must be supposed to have been settled. The investigation must proceed upon the assumption that what would have been a murder at common law has been perpetrated, and the only remaining question, the degree, within the meaning of the law. The statute says if it was deliberately and premeditately done, it is murder in the first degree, otherwise it is murder in the second degree; so that, to determine the degree of the

crime, all that is necessary is to determine whether it was, or was not deliberately or premeditately perpetrated. Not whether a murder has been committed, but whether an admitted murder is in the first or second degree. To determine this question, all that is necessary, very manifestly, is to determine whether it was done deliberately and premeditately. In order to come to a correct conclusion upon this proposition, it will be necessary to ascertain the signification of the terms employed. The word " deliberate " is derived from two Latin words, which mean, literally, " concerning," and " to weigh." When used as an adjective in the English, it means that the manner of the performance was determined upon after examination and reflection—that the consequences, chances and means were weighed, carefully considered and estimated. The term " premeditated " literally means plan, contrive or scheme beforehand. Considering these definitions, the intention of the lawgiver must be very apparent. It is not only necessary that the accused shall plan, contrive and scheme, as to the means and manner of the commission of the deed, but that he shall consider different means of accomplishing the act. He must " weigh " the modes of consummation which his premeditation suggests, and determine which is the most feasible. Such is the literal import of the terms used, and there is nothing in the act which indicates that they are to be understood in a different sense.

That such was the intended signification of the terms used, is further manifest from a careful examination of the whole section. It says, " Every murder which shall be committed by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing," shall be murder in the first degree. Here are two examples of what the legislature would consider " willful, deliberate and premeditated killing," viz: by poison, by lying in wait. It must be apparent upon a moment's re-

flection, that neither of these could be performed upon a sudden impulse—that prior planning and scheming and a weighing thereof must necessarily take place—that something beside the immediate circumstances of the homicide must appear. If the act is committed by means of poison, it is necessarily implied that some reflection was bestowed upon the kind of drug to be used and the probable effects thereof; the means of obtaining it; the time, place and circumstances at and under which it could be administered. If lying in wait, it must be inferred that a determination to do the act had been arrived at, an observation of the habits of the intended victim taken; and a selection of the place which would afford an opportunity for the commission of the act made.

These things, in neither case, could be done upon a sudden impulse. Both require some reflection upon the time, place and manner of the killing—some preparation with express reference to the homicide.

Now if these kinds of killing involve reflection, pre-determination, or preparation, then must the expression " any other kind of willful, deliberate and premeditated killing " include similar circumstances. It could not therefore be said, that if a killing took place under circumstances which excluded the idea of reflection, pre-determination or preparation, that it was done willfully, deliberately and premeditately; wherefore it could not be murder in the first degree.

Applying these considerations to the instructions given to the jury, the latter will not appear to be erroneous. Taken altogether, they do not contravene the law as above construed; but it is exceedingly difficult, as an effort of the memory, to reconcile them. As a practical fact, no ordinary jury would be able to reconcile, or comprehend them from a single hasty reading, such as is usually practiced in *nisi prius* courts. A much better practice would be for the court to treat the separate propositions requested

by counsel as suggestions, embody such as appeared to him to be correct and applicable in a succinct, connected charge, in no instance repeating in different form what has already been given, merely because counsel request it.

Another assignment of error is that the court neglected to inform the jury what constituted murder in the second degree and the four degrees of manslaughter. The statute provides that the court in charging the jury "must state to them all matters of law which are necessary for their information in giving their verdict."

It also provides in substance, that upon a charge of murder in the first degree, the defendant may be convicted of any offense necessarily included therein, which would embrace murder in the second degree and the various degrees of manslaughter. Now, inasmuch as it is very manifest that murder in the second degree and all the grades of manslaughter, are necessarily included in the charge of murder in the first degree, it was the imperative duty of the court, made so by the statute, to explain all of them to the jury. As the provision is plainly imperative, there is no necessity for attempting to sustain it by reason. It was error to omit to do so.

Finally, it is insisted that the verdict was against the evidence. This is an exceedingly delicate subject, and we enter upon an examination of it with much reluctance. But as the law requires it of us, when properly presented, there is no escape from it when the exigency arises. That exigency is upon us in this case.

The law provides that the jury shall be the exclusive judges of all questions of fact. That is, where there is any testimony at all upon a particular question, the jury must determine what that testimony proves. In that behalf their power is exclusive and supreme. But upon the question of whether there is any evidence of a particular material fact, they are not the exclusive judges. The law requires the court, after the jury shall have made its find-

ing, to determine that. Upon this branch of the case, then, the single duty of this court is to determine whether there was evidence upon each material fact, necessary to a legal conviction; and upon this subject the examination will be confined to a single point.

We have hereinbefore endeavored to explain the meaning of the terms, "deliberation and premeditation." Now is there anything in this record showing a deliberate and premeditated killing? These are facts which must be shown by evidence. The law does not presume or imply their existence from any state of circumstances. But it is not necessary that they be testified to directly. They may be inferred from the established circumstances of the case, provided the inference be a reasonable one; and no power but the jury has the right to make the inference. They are as well the judges of the inference as of the established fact, subject only to the limitation that it must be a reasonable inference. They are not bound to make the inference from any conceivable state of fact, yet they may do so, within the limitation above mentioned.

The deliberation and premeditation must be proved as well as the malice. There is a great deal in the law books and considerable in the brief of counsel about express malice and implied malice; but there is in reality no such distinction. They both mean precisely the same condition of mind. The law makes malice a necessary ingredient in both degrees of murder, and it is the same thing whether shown to exist by one set of circumstances or another. Its existence, as a fact, must be proved on every charge of murder. The law never presumes its existence. The manner of the proof may very widely differ in individual cases. In some it may be proved by declarations; in others by acts preceding the homicide, and in others still by the circumstances of the killing. Its existence in every case must be established by proof, either direct or circumstantial; never by presumption. So that, classifying it as express malice

and implied malice is to recognize a distinction where there can be no difference. It is just so with deliberation and premeditation. They are never, by the law, presumed or implied. They must be proved by evidence; but like malice do not require positive proof. The evidence may be circumstantial. The facts from which their existence is inferred may be very minute or remote, but there must be some evidence establishing their existence.

Applying these principles to the case at bar, it may be asked where in the record is the evidence that the killing in the case at bar was deliberately or premeditately done? Or where the circumstances, minute or remote, from which deliberation or premeditation can be inferred? The court has searched the record in vain for it. Not only is there no scintilla of evidence directly showing their existence, or from which with any show of reason it might be inferred, but on the contrary the evidence absolutely excludes the idea of their existence. There is nothing in it upon which to hang a doubt. According to the testimony, the defendant and the deceased, who were personal acquaintances and friends, met accidentally. A few words were exchanged and the killing effected immediately. Not a word about former grudges, threats or previous planning —nothing in the manner of the killing or the subsequent acts of the accused to indicate that there had been premeditation. The manner and immediate circumstances of the homicide might justify the finding that it was maliciously done, but we cannot only not find anything in the record showing deliberation or premeditation, but that there was either is conclusively disproved.

The error of the jury in this behalf seems to have grown out of the general supposition that homicide without sufficient provocation, must necessarily be murder in the first degree, and punishable by death. Such is not our law. It regards confinement as sufficient punishment for malicious homicide. It is only when the deed is done in cold blood

that death is to be inflicted. The penalty is to be graduated according to the malignity of the perpetrator. In other words, the degree of guilt depends alone upon the condition of mind of the accused. It is not vengeance that the law requires to be inflicted, as men are too apt to suppose, but punishment. The general disposition, in cases like the one at bar, would be to demand "an eye for an eye and a tooth for a tooth;" but the law of this state has not done so, and that, rather than popular feeling or prejudice must be our guide. It has made a very palpable distinction between the degrees of murder both in regard to what shall constitute each, and in the measure of punishment to be inflicted, and the distinction ought not to be refined away.

We are of opinion that the verdict was not warranted by the evidence.

The conclusion of the court therefore is, that the court below erred in refusing the indictment against the principal witness to be read; in neglecting to inform the jury as to the law of murder in the second degree and the various degrees of manslaughter, and in overruling the motion for a new trial.

The judgment will be reversed and the court below ordered to sustain the motion for a new trial.

All the justices concurring.