The State v. Henson.

---

No. 21,786.

THE STATE OF KANSAS, *Appellee,* v. B. W. A. HENSON, *Appellant.*

SYLLABUS BY THE COURT.

1. HOMICIDE—*Disqualification of Jurors.* The testimony of jurors with regard to their having formed opinions, held not to warrant the reversal of the ruling of the trial court holding them to be eligible to sit in the case.

2. SAME. The retention of a juror whose credibility had been attacked by a witness produced by the defendant, held not to constitute reversible error.

3. SAME—*Evidence of Insanity—Opinion Evidence.* The evidence of a witness concerning the opportunity he had had to observe the conduct of a person whose soundness of mind was in issue, held to have been sufficient to render him competent to give an opinion on the subject, and the sustaining of an objection to such testimony, held to have been error.

4. SAME—*Declarations of Defendant's Wife—When Inadmissible.* In the prosecution of a husband for the murder of his wife, declarations

made by her a few days before the homicide, to the effect that she had to leave him—that she could not stand it to live with him any longer—are inadmissible against him, not being within any of the recognized exceptions to the rule against hearsay evidence.

5. SAME — *Impeaching Witness — Cross-examination.* Ground for impeaching a witness by showing previous contradictory statements cannot be laid by cross-examination on a subject not touched upon in the direct examination.

6. SAME—*Nonprofessional Witness—When Evidence Inadmissible.* It is not competent for a nonprofessional witness to give his opinion as to whether a designated person was physically able to perform acts attributed to him by other witnesses.

7. SAME—*Evidence—Bad Reputation of Defendant.* The admission of evidence of the bad reputation of the defendant (who had taken the stand) for veracity fifteen years before, held not to have been a ground of reversal.

8. SAME — *Jurors Viewing the Place of Crime — Judicial Discretion.* Whether or not it is advisable to allow the jury to view the place where the offense charged is alleged to have been committed, is a matter for the determination of the trial court.

9. SAME—*Instructions.* The instructions held to be without substantial error, although containing a few expressions open to criticism.

Appeal from Sedgwick district court, division No. 1; RICHARD E. BIRD. judge. Opinion filed December 6, 1919. Reversed.

*S. B. Amidon, D. M. Dale, S. A. Buckland,* all of Wichita, *A. L. Noble,* of Winfield, *J. N. Tincher,* of Medicine Lodge, and *Alfred Bennett,* of Vanita, Okla., for the appellant.

*Richard J. Hopkins,* attorney-general, *J. K. Rankin, Winfield Freeman,* assistants attorney-general, and *J. A. Conly,* county attorney, for the appellee.

The opinion of the court was delivered by

MASON, J.: B. W. A. Henson was convicted of murdering his wife, and appeals.

He was born in 1848. He was married about 1868, and his first wife died about 1906. He married his second wife about November 1, 1915, in Missouri. He had been living on a farm in Oklahoma for some ten years, but with his new wife he moved to Wichita, where they occupied a rented house, about December 10, 1915. She was 49 years of age, and had

been married twice before, being divorced from her second husband, who was still alive. She had a son, known as Walter Schafer, twenty-five years old, afflicted with paralysis in the left arm and leg, who became a part of the household. The tragedy out of which the prosecution grows occurred at their home about 9 o'clock on the morning of December 29, 1915. Shortly after that time the police arrived and found the dead body of Mrs. Henson in the dining room, still upright in a chair in which at the time of the homicide she had been seated combing her hair. The left side of the upper portion of her head had been blown away by a charge from a shotgun, which, as shown by the marks on the adjacent wall, had ranged upward. There was also an open wound on the right side of her head, from which the brain was oozing. The dead body of Walter Schafer lay on the floor in the living room to the west (the front room of the house), into which a double doorway opened. His death had obviously been caused by blows on the head from the barrels of a shotgun, from which the stock, which was lying under the body, had been broken. One discharged shell was found in the gun and one upon the floor of the room where Mrs. Henson had been killed. A charge of shot had lodged in the ceiling of the front room.

The defendant took the stand in his own behalf, and gave this version of the affair: He was seated in the dining room with his wife when Schafer, who two days before had threatened to kill him, appeared in the doorway of an adjoining bedroom, in a stooping position, pointing the shotgun, both hammers of which were raised. He seized the barrels of the gun with his left hand, when it was discharged, killing Mrs. Henson. While the two men were struggling for the gun it was again discharged, this time into the ceiling. In the struggle the gun became unbreached, the defendant having hold of the barrels and Schafer of the stock. As they twisted it, the barrels and stock came apart. Schafer threw the stock at the defendant and, going out on the front porch, called for help, then reëntered the house and came toward the defendant with a knife in his hand, striking at him and saying he would cut his guts out. The defendant then gave the blows with the gun barrels which caused Schafer's death, after which he left the house to go to the home of a married daughter who lived in the city.

The state, to discredit this story, introduced evidence tending to show these facts: Schafer was not physically able to take the part assigned to him by the defendant's narrative, nor was his disposition such as to make it credible. The wound in the right side of Mrs. Henson's head showed that it was made by the blow of a blunt instrument, and long hairs from her head were found adhering to the gun barrels. Only one barrel of the gun had been recently fired; the other being clean, showed a reloading of the gun between the two shots. The second shot was heard after Schafer ran out on the porch, instead of before. No knife was found by the officers, excepting three closed penknives in Schafer's pocket. The defendant's general reputation as to veracity among his neighbors in Missouri fifteen years before had been bad.

The defendant produced evidence tending to show these facts: Although Schafer's left arm was practically useless, he had abundant strength in his right arm to handle the gun and do the other acts ascribed to him, and was abnormal mentally—of unsound mind—and of a violent and vengeful disposition. He had said to others that he would kill Henson, referring to him by an offensive epithet. The wound on the right side of Mrs. Henson's head might have been an effect of the shot. Only short hair—that of Schafer—was on the gun barrel. Schafer was in the habit of carrying in an inside coat pocket a knife with which he ate, the blade being four or five inches long—not a clasp knife. The defendant's general reputation for veracity had been good. The fact that the dead body of Mrs. Henson was found seated in the chair is urged as showing that she had not been struck on the side of the head with the gun, and that no altercation with her husband had preceded her death. And the circumstance that the fatal shot ranged upward is cited as strong evidence that it was not fired by the defendant.

The foregoing somewhat meager outline of the more important portions of the evidence perhaps affords a sufficient basis for weighing the effect of the rulings to be considered.

1. The defendant complains that a number of jurors who sat in the case, or upon whom he necessarily exercised peremptory challenges, were disqualified. Each of several of them on his *voir dire* gave affirmative answers (qualified however in his further examination) to questions whether he had

formed an opinion on the case from newspaper accounts; whether it would take some evidence to remove it; and whether that would require the evidence of one or more credible witnesses. If the giving of such answers were to be regarded as conclusive evidence of disqualification, most reading people would be thereby incapacitated for jury service in cases of enough public interest to warrant the attention of reporters. One who says that he does n't believe anything that he reads in the papers either is untruthful, facetious, or eccentric, or he uses the word believe as implying an abiding conviction. A normal person who reads a news item not intrinsically improbable, relating to a matter concerning which up to that time he had no information, gives it a tentative acceptance. His mental condition is not precisely the same as before. His mind is no longer a blank on the subject. Yet if he has no occasion to act upon his present information he ordinarily does not carefully weigh and balance its different parts and arrive at any settled conclusion—does not form what can fairly be called a fixed opinion, or an opinion at all, as distinguished from a mere involuntary impression. Yet this state of mind, whether it be called a fixed opinion, a belief, or a mere impression, will necessarily remain until something occurs to change it. It cannot be forgotten or eliminated by an effort of the will. Only new information on the subject can remove it—in other words, evidence. The fallacy of regarding the question whether it will take evidence to remove an opinion as the final test of its disqualifying effect lies in adopting a sort of quantitative theory of proof—the assumption that some of the force of the evidence introduced will be exhausted in overcoming even the most casual impression, so that a greater amount of testimony will be required to reach a contrary conclusion; whereas, in the case of a person of ordinary intelligence, as soon as he begins to consider legal evidence, on which he is justified in relying, the impressions he may have previously received cease to play any part whatever in the forming of his judgment. Chief Justice Marshall, in the Aaron Burr case, in words quoted with approval in *The State v. Medlicott,* 9 Kan. 257, 279, describes the opinions which do not disqualify as "light impressions, which may be supposed to yield to the testimony which may be offered." The real test of competency is whether

the juror has such a belief upon the merits of the case as might weigh with him in arriving at his verdict. Each of the jurors who were accepted, in effect, disavowed such a state of mind. That of course does not constitute highly persuasive evidence, but it is entitled to be considered.

. The bare language used by a juror in attempting to describe his mental attitude, especially where he merely accepts a formula put before him by counsel, is often a very unsatisfactory basis for passing upon his qualification. He not only experiences difficulty in making intelligible to others with precision his own state of mind, but is apt to be under a misapprehension as to the scope of the questions asked. For illustration, in this case several jurors who had assented to the proposition that they had an opinion as to the guilt or innocence of the defendant, later said that they had no opinion as to whether the killing was accidental and no opinion as to whether it was intentional. Some of them who had accepted the term "fixed opinion" as correctly describing the view they entertained, showed by their explanations that what they meant was that it would remain until they received new information. The appearance of the juror, his bearing and manner, are often of great consequence in interpreting his answers, and for that reason in any doubtful case the decisions of the trial court as to his eligibility must control. (*The State v. Stewart,* 85 Kan. 404, 116 Pac. 489.) It is not to be understood that a verdict will never be set aside because of the overruling of a challenge for cause based upon evidence showing the existence of a disqualifying opinion on the part of a juror who professes to be impartial. In over seventeen years, however (since *The State v. Morrison,* 64 Kan. 669, 68 Pac. 48), only one reversal because of the retention of challenged jurors has been ordered by this court, and there three justices dissented (*The State v. Stevens,* 68 Kan. 576, 75 Pac. 546). The fact that so large a share of responsibility in determining the question of a juror's eligibility rests upon the trial court is rightly regarded as a reason for the exercise of the greatest care in its consideration. In the present case we do not find that the rule referred to was extended beyond permissible limits, although it is true that in several instances the line of demarkation was approached rather closely. However, it is to be borne in mind that there

had been two previous trials, the juries having disagreed, and at this one over fifty jurors were excused for cause.

2. An objection was made to one juror on an additional ground. After all the peremptory challenges had been exhausted, but before the jury had been sworn to try the case, the defendant produced a witness who testified that one of the jurors who had been accepted, and was then sitting, had expressed to him an opinion that the defendant was guilty. The challenged juror denied this, saying that the remark attributed to him had really been made by the witness referred to. The trial court was of course the final judge as to which version of the conversation was correct. The defendant urges that the juror should have been excused because his own testimony contradicted a statement he had made on his *voir dire* that he had never talked with any one about the case. What he had said, however, was that he did not remember having done so. A final objection to this juror was, that because of his presumed resentment growing out of his veracity having been questioned, he was likely to have acquired a bias against the defendant, even if he had had none before. In a matter of this sort the trial court has such superior opportunities for arriving at a just decision that its conclusion must be regarded as practically final.

3. The defendant offered the deposition of a witness to the effect that he had known Schafer for about a year, having occasion to talk with him and hear him talk; that whenever he would see him and Schafer was where he could stop and talk, he would do so, telling the same story over again; that "he always had a kind of a simple story to tell," usually finishing up by telling him about some woman he went to school to that whipped him; that he would say "if it was to do over again I would down her." The testimony continued: "He told me that story I don't know how many times, and I would tell him to go on off, that I did n't want to hear it. . . . I saw him every day I guess while they kept store there, and after they quit keeping the store I saw him every little bit." The deposition included the statement that the witness did not think that Schafer was of sound mind, which was ruled out, apparently on the ground that the witness had not had sufficient opportunity for observation to make his testimony on this point

competent. It has been said that whether there is a fair basis for an opinion by a nonexpert witness as to a person's sanity must be left largely to the trial court. (*Kempf v. Koppa,* 74 Kan. 153, 85 Pac. 806.) That, however, was in a case where the error alleged was based on the admission of such evidence, the thought of this court obviously being that if the trial court regarded it as of some possible value, the judgment reached would seldom be disturbed on review on account of its admission. Reversals have been ordered both before and since that opinion was written, because of the rejection of such testimony on the ground that the opportunity for observation had not been sufficient. (*The State v. Beuerman,* 59 Kan. 586, 53 Pac. 874; *The State v. Rumble,* 81 Kan. 16, 105 Pac. 1; *Fish v. Poorman,* 85 Kan. 237, 116 Pac. 898.) We think that here the opportunity was such as to render the testimony admissible. Its weight, of course, was for the jury. Its importance can hardly admit of doubt. The whole defense was based upon the theory that the homicide was the result of acts of Schafer that could only be accounted for by a disordered intellect. The evidence went to the vital point of the controversy.

4. Two witnesses were permitted to testify over the objection of the defendant that a few days before the homicide Mrs. Henson had said that she had to go away, that she could not live with Mr. Henson—that she was going to leave, that she could not stand it to live with him any longer. The defendant was not present when these statements were made, and no knowledge of them was brought home to him. The declarations of the victim of a homicide, not immediately connected therewith, but offered to show the attitude of the accused toward him, are not within any of the recognized exceptions to the rule against hearsay evidence. They have been explicitly held inadmissible by this court (*The State v. Reed,* 53 Kan. 767, 37 Pac. 174), and apparently by all others that have passed upon the matter. (16 C. J. 639.) The ruling must be pronounced erroneous. The prejudice to the defendant is manifest. The apparent absence of any adequate motive for the defendant's killing his wife was a circumstance that tended to give plausibility to the theory that her death was the act of an insane person. Any evidence of prior illtreatment of his wife, or estrangement from her, however slight in itself, be-

came obviously of the greatest consequence, because the only other testimony on the subject was that of the sheriff's daughter concerning a statement by the defendant while in the jail to his daughter and daughter-in-law, which they testified had not been made.

5. A somewhat similar question arises in a different way. Mrs. Brockus, a daughter of the defendant, was a witness in his behalf. On cross-examination she was asked if she had not said to a Mrs. Davidson, the time and place being stated, that Mrs. Henson had told her she had to go away—that she could not live with Mr. Henson. She answered that she had not. In the state's rebuttal Mrs. Davidson was permitted to testify, over objection, that Mrs. Brockus had made that statement. The jury were instructed that they were at liberty to consider this only as impeaching testimony—as throwing light on the credit to be given to the evidence of Mrs. Brockus. Upon the direct examination of Mrs. Brockus, however, she had made no statement with which that attributed to her by Mrs. Davidson was in conflict. Therefore, she was not open to impeachment in that manner. (40 Cyc. 2693, 2738.)

6. Several witnesses for the state, one of whom was a physician, were permitted to give their opinions to the effect that it was a physical impossibility for Schafer to have done a number of acts testified to by the defendant and his witnesses. It was doubtless competent for a physician to give his opinion as an expert regarding the probable result of conditions he had observed in Schafer, as affecting his strength and activity, although there is room for doubt whether the evidence of the medical witness who was called is open to that interpretation. But there was no occasion for nonprofessional witnesses stating their conclusions on the subject. They could readily have stated what they had observed in Schafer's conduct, and from these facts the jury were as competent as the witnesses to draw inferences concerning his ability to handle a gun and do the other acts ascribed to him. Their testimony was therefore incompetent. (3 Wigmore on Evidence, § 1918, p. 2552.) The ruling was prejudicial because it bore upon one of the principal matters in dispute.

7. The defendant complains of the admission of the testimony of a number of witnesses who stated that his general

reputation for truth and veracity in the community in which he had lived in Missouri fifteen years before had been bad. It has been said that such evidence relating to a remote time is admissible only where similar evidence is produced in reference to the more recent period. (40 Cyc. 2597.) One witness, who had lived twenty-five miles from the defendant's home in Oklahome seven years before the trial, testified that he then bore a bad reputation in the respect referred to. If evidence of the character of that complained of were to be excluded by a trial court on account of its remoteness in time, the ruling would hardly be deemed a ground of reversal. But we do not regard its admission as requiring the verdict to be set aside.

8. Complaint is made of the refusal of the court to allow the jury to view the inside of the house where the homicide had occurred. There was evidence that without the fault of either party some change had been made since the occurrence —new wall paper had been hung over the place in the dining room where the shot had struck. Whether it was advisable to allow the jury to inspect the premises was a matter for the determination of the trial court in its discretion. (Gen. Stat. 1915, § 7186.)

9. Various complaints are made regarding the instructions. We regard the charge on the whole as fairly presenting the matter to the jury, without substantial error. Occasional expressions, however, occur, doubtless through inadvertence, which are not as accurate as might be desired. The jury were told in effect that testimony that long hairs were seen on the gun was entitled to greater weight than testimony that none were seen, but that in the case of witnesses who swore that they saw no long hairs, although they made a special examination for the purpose of ascertaining whether any were there, the rule would not "necessarily" apply. The word quoted appears to detract from the just effect of the qualification. An instruction was given undertaking to adapt the same rule to testimony concerning threats against the defendant made by Schafer. The statement was made in this connection that some witnesses had testified that they had heard such threats and others that they did not hear them. The defendant asserts that no such negative testimony was given. If that is the case, and it seems to be, the statement

was inaccurate and to that extent misleading, although not of a kind likely to work substantial prejudice. One instruction began by stating that the defendant had entered a plea of not guilty and *also* relied for an acquittal on the ground of accidental homicide. The inference might have been drawn from the language that the claim of accident presented a different defense from the plea of not guilty, in which case it was open to objection. In the course of a discussion of the evidence bearing on the question whether the killing was accidental, the jury were invited to consider whether the defendant's life was in danger, and whether he thought so, upon reasonable grounds. A confusion in the minds of the jury might possibly have arisen from this coupling of accident and self-defense. Other criticisms of the instructions are not regarded as requiring specific mention.

We are unable to say that there is no reasonable probability that the verdict was influenced by the rulings, held to have been erroneous, relating to the admission and exclusion of evidence bearing upon the vital matters in controversy. Their cumulative effect increases the likelihood of actual prejudice having resulted. The conviction must therefore be set aside.

The judgment is reversed, and the cause is remanded for a new trial.