The State v. Waldron.

---

No. 25,684.

THE STATE OF KANSAS, *Appellee*, v. JOHN W. WALDRON, *Appellant*.

SYLLABUS BY THE COURT.

1. VENUE—*Prosecution for Rape—Grounds for Change.* In a prosecution for the offense of statutory rape, the record examined and held not to demonstrate prejudicial error in denying defendant's motion for a change of venue.

2. CONTINUANCE—*Illness of Defendant.* The error assigned on the trial court's refusal to grant a continuance considered and not sustained.

3. JURY—*Prosecution for Rape—Qualification and Competency.* Under the circumstances stated in the opinion, which tended to show a prevalent prejudice against the defendant in the community where the offense charged against him was committed, it was neither error nor prejudicial denial of defendant's constitutional rights for the trial court to order that jurors drawn from that particular community would not be used for jury service in the case being prosecuted against defendant; and such order had the sanction of statute R. S. 43-123.

4. SAME—*Selection—Challenge for Cause—Grounds.* Record of *voir dire* examination of a juror examined, and held that the trial court's abuse of discretion in overruling defendant's challenge for cause is not so clear as to permit a reviewing court to declare that the ruling constituted prejudicial error.

5. WITNESSES—*Belated Indorsement on Information.* The belated indorsement on the information of the names of witnesses, permitted by the trial court, considered, and no abuse of discretion or of prejudice to the rights of defendant discerned therein.

6. RAPE — *Evidence* — *Letters Savoring of Criminal Intimacy With Others.* Where the evidence to support a prosecution for statutory rape was largely that of the uncorroborated testimony of the prosecutrix, and the defendant took the witness stand in his own behalf and testified to his long career as a minister of the gospel and denied *in toto* the charges against him, denied that he ever took liberties with the prosecutrix, who was his parishioner, or with other young girls of his congregation, it was not improper to admit in evidence, as part of his cross-examination, letters which defendant admitted he had written to another young girl, the contents of which savored of a criminal intimacy with the addressee, and showed that their author, the defendant, had a grossly immoral attitude towards young girls, and strongly tended to discredit his denial of the truth of the state's evidence against him.

7. SAME—*Evidence—Exclusion of Original Complaint.* Certain rejected evidence offered by defendant examined, and *held,* that while it should have been admitted, its rejection was nonprejudicial.

8. SAME—*Instructions.* Errors assigned on the giving and refusal of instructions examined and not sustained.

Appeal from Barton district court; LE ROY E. QUINLON, judge. Opinion filed June 6, 1925. Affirmed.

*Guy L. Hursh,* of Topeka, for the appellant.

*Charles B. Griffith,* attorney-general, *C. A. Burnett,* assistant attorney-general, and *Harry B. Asher,* county attorney, for the appellee; *D. A. Banta,* of Great Bend, of counsel.

The opinion of the court was delivered by

DAWSON, J.: The defendant, John Waldron, was convicted in the district court of Barton county of three offenses of statutory rape on the person of a girl under eighteen years of age. He appeals, assigning various errors, which will be noted *seriatim* as they are argued.

Defendant contends that the trial court committed prejudicial error in refusing his application for a change of venue. The circumstances were these: Waldron had been pastor of a leading Protestant church in Great Bend for two or three years, during which time his alleged criminal intimacy with the young prosecutrix occurred. The girl was a member of his church and was also an officer of one of the affiliated church societies under Waldron's supervision while he was stationed at Great Bend. Some months before his arrest he had moved to Oklahoma City, where he was serving as minister of a large church. He was the type of man who always took an active interest in civic affairs as well as church activities in whatever community he sojourned, and was well known in Great Bend and in Barton county where he would have to stand trial.

The State v. Waldron.

That a minister of the gospel should be charged with such a grievous offense on the person of a young woman whose spiritual mentor he was would naturally arouse prejudice against him if the charges were the subject of much discussion in the community, and particularly if the details involved in the charges were repeated with such plausibility as to induce a prevalent belief in their truth. On behalf of defendant a rather persuasive showing was made that a change of venue should have been granted. It was supported by affidavits of various citizens, and the circumstances themselves constituted a strong showing to the same effect. Against this showing the state filed an affidavit signed and sworn to by thirty-five citizens of Barton county, who averred that they were acquainted with the sentiments of the people touching the charges against Waldron and that they were sure there would be no difficulty in securing a jury in that county that would give him a fair and impartial trial. The change of venue was denied. Defendant calls attention to the later developments of the trial which tended to prove that the ruling was erroneous. Such proof, it is argued, inheres in the fact that practically all the men examined as jurors, about thirty in number, admitted that they had heard about the case, had read of it in the local newspapers or in those of Hutchinson and Wichita, and had frequently heard it discussed in the community. Quite a number of these men so frankly admitted that they had such decided opinions touching the guilt or innocence of the defendant that they were excused from jury service. Another feature which defendant urges as potent evidence that he could not get a fair trial in Barton county is that he was promptly convicted by the jury on three counts, notwithstanding that the offenses alleged in the first and third counts were disproved by quite a plausible alibi. An error based on a denial of a change of venue is a difficult matter for an appellate court to lay hold of. The statute contemplates that a change of venue is an occasional requisite, not merely to prevent a sure and certain miscarriage of justice, but wherever it is likely that defendant cannot get a fair trial because of local prejudice against the defendant. (R. S. 62-1318.) In this case we cannot give our assent to the contention of the state that "the weight of evidence was vastly preponderating" against the need of a change of venue. The mere number of signatures appended to a circularized affidavit does not necessarily constitute a preponderance of evidence on a question of the need and propriety of a change of venue. All this court cares to say is that

the trial court's abuse of discretion in denying a change of venue is not conclusively established by the record, so the error urged thereon cannot be sustained. (*The State v. Horne,* 9 Kan. 119; *The State v. Bohan,* 15 Kan. 407; *The State v. Adams,* 20 Kan. 311; *The State v. Mullins,* 95 Kan. 280, 289, and citations, 147 Pac. 828.)

Defendant's second contention is that he was prejudiced by the denial of a continuance. For some time prior to his arrest he had been confined to a hospital in Topeka with some undefined sort of illness; in fact, he had been ill for some time in Oklahoma before he came to Topeka. Notwithstanding his illness, he was taken to Great Bend on February 22, 1922, for his preliminary examination, after which he returned to Topeka and was in bed most of the time for the next two weeks until he had to return to Great Bend for trial. He produced affidavits of two Topeka physicians, who defined his malady as anemia, low blood pressure, low vitality and nervousness; and the doctors gave their opinion that he was not in condition either physically or mentally to stand the strain of a criminal trial and to properly confer with his counsel and take the witness stand in his own behalf. The state produced three doctors who examined Waldron and testified as to his condition. In their opinion he was not unfit to go to trial, and one of these doctors ventured his professional opinion that he was not likely to improve until after his trial. The latter testified:

"I examined him for the purpose of reaching a conclusion with respect to his present mental status, and found that of a man who is worried. I think he is competent to engage in the trial of this case. I don't see any prospects of his feeling any different until he gets this burden off his mind. His present nervous condition is not such as will interfere with the trial and he would be better off to have the thing settled one way or the other. . . . In my opinion he is ready to go to trial.

"*Cross-examination:* . . .

"No, he is not what we would consider a well man. . . . I am informed and believe that it is true that he has not eaten more than a quarter of a meal for two or three months. His strength is below par. . . . He is worried and has not been sleeping. . . . It is a subnormal condition; it does not affect the mind. From what I have known of him before I would say that he is not his normal self, and to my certain knowledge he is making this worse than it is and I can tell you why. . . .

"Q. You don't mean he is shamming it?  A. Yes. . . .

"By the Court: Doctor, are you familiar with the amount of physical and mental strain that a defendant charged with the offense of this nature would have to go through?

The State v. Waldron.

"A. I think I am. I have seen people under nervous and mental strains for many years. . . .

"A. I understand what you are talking about quite well.

"A. . . . . I think that he can do this thing now just as well as he ever can; perhaps better now than he ever can, if he worries about it until the next term of court."

The matter of a continuance is largely discretionary with the trial court. On the evidence of these medical experts, it. cannot be said the trial court abused its discretion, and, indeed, nothing afterwards transpired at the trial which could be said to show that Waldron's indisposition at its commencement was any handicap to him in making his defense. (*Bliss v. Carlson*, 17 Kan. 325; *Moon v. Helfer*, 25 Kan. 139; *Westheimer v. Cooper*, 40 Kan. 370, 19 Pac. 852; *Clouston v. Gray*, 48 Kan. 31, 36, 28 Pac. 983; *The State v. Sweet*, 101 Kan. 746, 752, 168 Pac. 1112.)

The next complaint urged by defendant relates to the trial court's order that no jurors resident in Great Bend would be used in the trial. The order was:

"I want to state before we draw these jurors that the jurors drawn who reside in the city of Great Bend will not be used in this case."

It is argued that such ruling denied the defendant his constitutional right to be tried by a jury of the whole county in which his offenses were alleged to have been committed. (Bill of Rights, § 10.) He argues that to arbitrarily exclude jurors from Great Bend violated his rights, and he cites the case of *Jackson v. Pool*, 91 Tenn. 448, in support of this contention. We have examined this authority. It was there held that in an action against the city of Jackson for damages for injuries sustained from a defective sidewalk, it was prejudicial error for the trial court to order the sheriff not to summon taxpayers or residents of the city of Jackson to serve as jurors, but to get the panel from other parts of the county. That decision was rendered in 1892. The views of courts in general as well as of this court have been greatly modified in the last thirty years. Vastly less importance is given nowadays to mere colorable lapses from technical rights, so long as there can be no misgiving of. possible prejudice against the accused on trial. Here not only was no prejudice shown, but the court's order was obviously intended to favor the defendant. Defendant had made a showing that local prejudice existed which would tend to prevent him from getting a fair trial in Barton county. Any such prejudice would probably be

more acute in Great Bend, where the prosecutrix and her family resided, where defendant had publicly acted the rôle of minister of the gospel, and where he was charged with having privately acted the rôle of a Lothario with a girl under age, for whose correct spiritual and moral upbringing he was next in responsibility to that of the seniors of her own family. In this state it has long been a very common practice when a notorious criminal case is to be tried and a special venire of jurors has to be called, that the trial court will order the sheriff to summon jurors from parts of the county remote from the community where the crime was committed, on the assumption that such jurors would be less likely to be disqualified because of personal knowledge of the facts or of opinions formed thereon. Since 1907 this practice has had express sanction by statute. R. S. 43-123, in part, reads:

" . . . That when the case on trial is of general notoriety, the court may, when he makes the order for said additional venire, order that all names drawn from said box who reside in any particular city or township in said county be not returned as jurors."

The order touching the exclusion of citizens of Great Bend from jury service had the sanction of statute, and neither the statute nor the court's order transgressed any constitutional right of defendant.

Error is assigned in overruling the defendant's challenge of Edward Kuhl as juror. Kuhl's *voir dire* was rather unsatisfactory. Both the state and the defendant challenged him for cause, but the trial judge took him in hand himself and developed a line of questions which seemed to qualify him. The record, in part, reads:

"Q. You heard me read the charge pending against the defendant Waldron? A. Yes, sir. . . .

"Q. Did you read anything about it in any paper? A. Yes, sir.

"Q. What paper? A. Hutchinson *News.*

"Q. From what you read, did that cause you to form or express an opinion as to the guilt or innocence of this defendant? A. Why, yes.

"Q. Do you have that opinion at this time? A. Yes.

"Q. Is that such an opinion that would require evidence to remove? A. Yes, unless proven otherwise. . . .

"Q. You said you had an opinion? A. Yes. .

"Q. I want to ask if that would require evidence to change that opinion? A. Yes.

[Counsel for the state:] "We challenge the juror for cause.

"By the Court: Mr. Kuhl, the only thing that you know is what you read in the Hutchinson *News?* A. Yes, sir; that is all.

"Q. It didn't give the facts surrounding the transaction? A. Not that I know of.

"Q. Just recited the fact that this defendant is charged with a crime of rape? A. Yes, sir.

"Q. And from that you want to state to the court that you have a definite conclusion one way or the other in the case? A. Why, no.

"Q. I mean an opinion of his guilt or innocence? A. Well, I got just what was in the paper is all.

"Q. Now, do you want to state to the court that from an article you read you are ready to state you have a definite and fixed opinion as to the guilt or innocence of this defendant? A. No.

"Challenge will be overruled."

Examination of Edward Kuhl by the defendant:

"Q. Did you at any time form an opinion as to whether or not the defendant was guilty? A. Well, it was pretty hard to keep from forming an opinion.

"Q. When you read what you did and when you heard the statements you heard, you believed what you read and believed what you read [heard]? A. To a certain extent; yes.

"Q. No occasion for disbelieving the information you were given? A. No; you got to believe some of the things you read and hear.

"Q. Did you at that time form an opinion as to whether this defendant was probably guilty or innocent? A. Yes, sir.

"Q. Do you have that opinion now? A. Why, until it is shown different. . . .

"Q. Do you have an opinion at the present time of such a nature that up until the time you will hear some evidence from the witness stand you would retain that opinion? A. Why, yes.

"Q. And before that opinion would be removed you would have to hear evidence from the witness stand concerning it? A. Yes, sir. . . .

[Counsel for defendant:] "We challenge this juror on formation of opinion that would be prejudicial in this case.

"By the Court: Mr. Kuhl, knowing the qualifications of a juror as has been explained to you, do you feel that you can give this defendant a fair and impartial trial? A. Yes, sir; I believe I can give him a fair trial.

"Challenge overruled.

[Counsel for defendant:] "Then I desire to interrogate him a little further."

Counsel then asked some inconsequential questions designed to disarm the juror's possible hostility at being challenged, concluding his examination thus:

[Counsel for defendant:] "Q. Would the mere fact that the defendant challenged you and the court overruled that challenge have any effect upon you? A. No, sir.

[Counsel for defendant:] "Subject to our exceptions to the court's ruling on our challenge we pass the juror."

Under the rule announced and discussed in *The State v. Henson,* 105 Kan. 581, 584, 585, 185 Pac. 1059, and earlier cases cited therein,

it cannot be held that the challenged juror was disqualified, although this particular case is near the border line. Cases there may be in the sparsely settled portions of the state where the getting of enough impartial jurors to serve acceptably in a notorious case is quite a serious problem (*The State v. Pearce,* 87 Kan. 457, 124 Pac. 814), but in a large and well-populated county like Barton there should be no need of using a juror whose mental attitude was that he had an opinion as to the guilt of the defendant and would retain that opinion "until it is shown different." The rule that the qualification of jurors is left largely to the trial court's discretion has its limitations. In *The State v. Henson,* supra, a cautionary reminder of the possibility of committing error by stretching that discretion too far was given by Mr. Justice Mason, speaking for the court, thus:

"It is not to be understood that a verdict will never be set aside because of the overruling of a challenge for cause based upon evidence showing the existence of a disqualifying opinion on the part of a juror who professes to be impartial." (p. 586.)

The next error urged relates to the belated indorsement on the information of the names of witnesses. A court should be very careful about permitting the names of additional witnesses to be added at the last moment before the case is called for trial. The court ought to be sure the prosecuting attorney is not acting unfairly, and where there is a possibility of intentional or unintentional unfairness to the accused, time should be granted, even to the extent of a continuance, if necessary, to insure the correct and impartial administration of justice. (*The State v. Price,* 55 Kan. 606, 40 Pac. 1000.) However, in this case, it cannot be said that the belated additions to the state's roll of witnesses operated unfairly towards the defendant. (*The State v. Mullins,* supra, syl. ¶ 5; *The State v. Howland,* 100 Kan. 181, syl. ¶ 1, 163 Pac. 1071.)

Error is assigned in the admission in evidence of certain letters written by defendant to a certain young woman. These letters were introduced as a part of the cross-examination of defendant. These letters were very damaging to defendant's credibility in this respect: Defendant was a minister of the gospel, married, and the father of a family, and naturally would be presumed to be a clean-minded, moral gentleman, and especially entitled to confidence in his veracity. He took the witness stand in his own behalf and told that he had been a clergyman for many years, occupying positions of prominence in one of the foremost Protestant denominations in the land, and that he had served overseas as a Y. M. C. A. worker during the

World War. He denied that he was accustomed to take liberties with young girls, including the girl to whom the letters were written. He denied *in toto* the testimony of the prosecutrix touching his criminal relations with her. Their alleged criminal intimacy did not culminate, as so frequently happens, in the birth of a child; at least, the record does not so disclose; and naturally the state could produce little testimony to corroborate that of the prosecutrix. And so the state made the most of its opportunity in cross-examining the defendant, and the letters complained of got into this case not at all irregularly, but quite properly as part of Waldron's cross-examination. And those letters, admittedly written by Waldron, savored of a criminal intimacy with the addressee, and demonstrated to the jury, to the trial court, to this court, too plain for controversy or cavil, that defendant had the mind of a vulgar libertine, as far removed from the mental and moral standards required of a minister of the gospel as light is from darkness, and of course the letters tended to discredit his asseverations of innocence by revealing with damning clarity his grossly indelicate attitude towards young women of his congregation with whom his ministerial calling gave him special and trusted social contacts. Within the rule discussed in *The State v. Bowers,* 108 Kan. 161, 165, 194 Pac. 650, the admission of Waldron's letters was not error. In that case it was said:

"However, as the record is presented it appears that the matters in question were brought out upon the cross-examination of the defendant. The inquiry was evidently made not for the purpose of proving his guilt of the offense charged, but with a view of affecting his veracity and credibility as a witness. It has been held that when a defendant takes the stand and assumes the character of a witness he is subject to the same tests as other witnesses, and for the purpose of impairing his credibility he may be cross-examined as to his past life and conduct and as to any specific facts tending to disgrace or degrade him, although they are irrelevant to the commission of the offense charged. (*The State v. Pfefferle,* 36 Kan. 90, 12 Pac. 406.)"

Error is also urged in the exclusion of defendant's offer of the original complaint in evidence. In that document the prosecutrix had sworn that the first offense was committed in June, 1922. Later she changed the date to April, and still later to March. Both the state and the defendant catechized the girl fully on that matter; and while the trial court would have done well to let it in rather than run the risk of error by excluding it, yet after carefully considering the point we cannot say that the rejection of this document rises to the gravity of prejudicial error.

The final error pressed on our attention relates to the instructions

given and refused. Defendant objected to two instructions, one which told the jury that the state did not need to prove the exact time when any of the offenses had been committed, and the other told the jury that the letters of Waldron which were so disastrous to his defense were only admitted for the purpose of determining the weight and credibility which should be accorded his testimony. These instructions were not erroneous.

We have noted the instructions requested by defendant which the trial court refused to give, although some of their features were incorporated in those given. But we think those given sufficiently covered the case, and we discern nothing requisite to guide the jury to a fair and impartial verdict which was omitted. The error assigned on this point cannot be sustained.

The record contains no plain, palpable, prejudicial error which would warrant a reversal of this case, and the judgment is therefore affirmed.