No. 29,666.

THE STATE OF KANSAS, *Appellee,* v. NATHANIEL GIBSON, *Appellant.*

(292 Pac. 931.)

Opinion filed November 8, 1930.

*W. W. Redmond, P. G. Wadham,* both of Marysville, and *W. J. Gregg,* of Frankfort, for the appellant.

*William A. Smith,* attorney-general, *R. O. Mason,* assistant attorney-general, and *A. D. Keller,* county attorney, for the appellee; *Raymond E. Smith,* of Marysville, of counsel.

The opinion of the court was delivered by

DAWSON, J.: The defendant was convicted of the felonious crime of statutory rape.

It appears that in 1929, when the offense was committed, the prosecuting witness, Mary Zentz, then seventeen years old, lived with her parents in Marysville. The defendant, Nathaniel Gibson, also about seventeen years old, lived with his parents on a farm near Oketo, a few miles north of Marysville. In February of that year these two young persons became acquainted; and in April, according to the girl's testimony, illicit sexual relations began between them and continued uninterruptedly, three or four times a week, except one week when defendant had the measles, until July 5, at which time the girl broke her leg in an automobile accident. This illicit relationship was renewed in August while her leg was still in a plaster cast.

On September 5 the girl called on the county attorney and informed him that she was *enciente* and defendant was responsible. That officer wrote to defendant of that fact and advised him to call. Defendant went to see the county attorney, who referred him to the father of the prosecutrix. Defendant called on the father, and the latter's testimony reads:

"I asked him what he wanted to do about daughter, and he said nothing. I said, well, that is funny. He said, I am not going to marry her; I will take a chance at the penitentiary first."

Defendant's version of the conversation reads:

"I told him then that I didn't think Mary was that kind of a girl, and I said I would go to the penitentiary before I would live with a woman and a baby that didn't belong to me; and he said, well, he started it and was going to see it through, and I said all right."

· This prosecution was instituted soon afterwards. A child of normal appearance and development was born to Mary on January 27, 1930, and it was present in, the court room with its mother throughout the trial.

Aside from defendant's unqualified denial that he ever had carnal intercourse with the prosecutrix, his principal defense was an alibi to this effect: Throughout the last half of April and the first half of May, 1929, during which period the child must have been begotten, defendant was confined to his home with the measles; that during that illness he caught cold which aggravated his ailment and delayed his recovery therefrom, and during that entire interval he was not in Marysville and did not see the prosecutrix; that he was taken ill on April 16 and did not recover therefrom so as to be able to leave his home until the middle of May. The testimony of the defendant's mother, father, sister, brother-in-law, sister-in-law, and several other witnesses was all to that effect.

On motion of defendant the state was required to elect on which of the many instances testified to by the prosecutrix it would rely to support the offense charged in the information. Counsel for the state complied as follows:

"The state relies for conviction of the defendant in this case on the transaction claimed to have taken place wherein the defendant had sexual intercourse with the prosecuting witness on or about the last week or ten days of the month of April, or first part of May, said intercourse taking place . . . at Marysville, Marshall county, at the home or in front of the home of Mary Zentz."

Defendant assigns certain errors, the first of which relates to the exclusion of proffered evidence which, in the opinion of defendant's counsel, would have shown that the prosecutrix was unworthy of credence. This excluded evidence was a little book of forty printed pages of lewd jokes and salacious doggerel. The prosecutrix identified the book and testified that she had given it to a sister of defendant. She also identified certain slips of paper on which she had written some quips of disgusting vulgarity. The defendant and his sister testified that the prosecutrix had placed this book in the breast pocket of defendant's coat. His counsel argue that as the prosecutrix had represented herself to be a modest, chaste girl until she had been seduced by defendant under promise of marriage, the book and writings were competent and potent evidence to prove the contrary—that she was not a pure-minded, virtuous girl, and that her testimony was manifestly untrue.

While the rule is that on cross-examination of a witness her previous bad conduct and past specific acts which tend to discredit her can be shown (*State v. Smith*, 114 Kan. 186, 217 Pac. 307), yet the extent to which that may be done rests largely in the discretion of the trial court. (*State v. Pfefferle*, 36 Kan. 90, 12 Pac. 406; *State v. Nossaman*, 120 Kan. 177, 183, 243 Pac. 326.) It cannot be gainsaid that if the court had permitted the contents of the book and writings to be read it would have completely upset the decorum of the court room. It would have been entirely proper for counsel to have formulated a short statement of the general character of the book and writings without quoting the filthy stuff itself, and to have asked the court to admit such statement of contents in contradiction of her testimony that she was a modest, virtuous, pureminded girl until she was seduced by defendant. (*State v. Waldron*, 118 Kan. 641, syl. ¶ 6, 236 Pac. 855.) While that much might have been permitted, this court cannot hold that it was prejudicial error to refuse to permit the obscene rubbish to be read to the jury in a public court room filled, in all probability, with the usual morbid crowd of bystanders attracted to the trial of a rape case. Moreover, there is no rule of evidence nor of casuistry which holds that gross depravity of mind is indicative of want of veracity. (*Craft v. State*, 3 Kan. 450, 480, 481.)

Defendant also complains of the indefiniteness of the election made by the state concerning which specific act of copulation testified to by the prosecuting witness it would rely upon for conviction on the single offense charged. This election was sufficiently specific so that defendant was not misled thereby. (*State v. McCarthy*, 124 Kan. 20, syl. ¶ 3, 257 Pac. 925.) However, defendant does make a just criticism of the court's instruction No. 9, where the stereotyped rule was given to the effect that if the offense was shown to have been committed by defendant as charged in the information at any time within two years prior to the date the prosecution was commenced and a warrant issued thereon, it would be the jury's duty to return a verdict of guilty. Such a blanket rule of law is seldom fair to a defendant when his main defense is an alibi. The state had elected to say that the crime was committed during the latter part of April or the first few days of May, 1929. The instruction objected to, if considered by itself, would mean to the average juryman that the election of the state didn't amount to anything,

that the testimony of defendant's cloud of witnesses that he was confined to his home with a serious illness during the interval covered by the state's election might be entirely disregarded even if true, since under instruction No. 9 a conviction might be had if the offense had been committed at any time within two years. However, the court did instruct with painstaking care concerning the state's election and the consequent narrowing of the jury's field of inquiry to the truth of the evidence supporting the charge. In part, the instructions given read:

". . . And you are further instructed that the state . . . has elected to stand for a conviction in this case on the act of sexual intercourse testified to by the witness Mary Zentz as having taken place on or about the last week of April, or the first week or ten days of May, 1929, the same being the act of sexual intercourse claimed to have taken place at her house or in front of her home, in Marysville, Kan.; and your inquiry in this case must be directed to the question whether or not the defendant had sexual intercourse with the said Mary Zentz, at or about that time and place, and whether the said Mary Zentz at said time and place was a female under eighteen years of age.

. . . . . . . . . . . . . . . . . .

"On the other hand, if you should fail to be so satisfied, . . . you should then return a verdict finding the defendant not guilty, even though the defendant had at some other times and places had sexual intercourse with said Mary Zentz, unlawfully. The law does not permit you to find the defendant guilty of any other offense in this case than the one charged, and upon which the state in the course of this trial has elected to stand for a conviction."

The court holds that prejudicial error in the instructions does not appear.

Another complaint is based on the fact that the child of the prosecutrix begotten of the alleged illicit relationship was present in the court room throughout the trial. We cannot discover that the child was offered in evidence, nor that its presence was objected to during the trial. It is not easy to see what could have been done with the infant when its mother had to be in attendance as the state's principal witness. The error based on this point is not sustained.

An error of more serious gravity is assigned on the misconduct of one of the jurors. When the case was submitted to the jury they deliberated on their verdict until 11:30 p. m., and were permitted to separate until 8:30 the following morning. One of the jurors, Frank Arbuthnot, conducted a garage at the county seat, and before he reported for duty that morning it occurred to him that his business files might throw light on the sharply contested point of prime importance in the trial—whether defendant was in Marysville about

the time the child was begotten, his main defense being that he had been confined to his home with the measles at the time. Arbuthnot consulted his files and discovered that the Gibson car owned by defendant's father, but commonly driven by defendant, had been serviced at Arbuthnot's garage on April 24, 1929. At the hearing on the motion for a new trial, Arbuthnot testified:

"Q. Didn't you look at your books and find out? A. I happened on it before I came up that morning in looking for a grease card; there might have been one or two of the jury with me.

"Q. That was before you came up here to court? A. Yes.

. . . . . . . . . . . . .

"Q. And your opinion is that there was one or two jurors with you and saw or heard that? A. There might have been.

"Q. What was said at that time, what your books showed? A. Well, when I ran onto it I says to whoever was around that the boy was evidently in town on the 24th of April.

. . . . . . . . . . . . .

"Q. How did you come to find this record—grease card, I believe you called it? A. I was looking for a grease card of another man and ran onto it.

. . . . . . . . . . . . .

"Q. That was some time along about eight o'clock in the morning? A. Yes, sir.

"Q. After you came up here to the courthouse the jury retired and you agreed soon after that? A. Yes, sir; it was not very long."

After the jury had reached a verdict but before they returned to the court room to report their verdict, Arbuthnot told his fellow jurors what he had discovered that morning in the office files of his garage. Juror Lamb testified:

"He [Arbuthnot] said for his own curiosity he looked it up. . . . That he had just looked to see, that he just kind of wondered about it, and thought that he had seen him there, and he looked to find out.

"Q. He said he had seen him there on that day, and to be sure about it he looked to see if he was there? A. Yes, I think so.

"Q. That was what he said, was it? A. I think so, yes."

Juror Guffee testified:

"Q. What did Mr. Arbuthnot say, . . .? A. . . . . I think he said Gibson's car had been worked on in his garage and had been oiled there; that his books showed that on the 24th of April."

Juror Olson testified:

"Mr. Arbuthnot said that after he heard the defendant say he had not been in Marysville the latter part of April, 1929, that thinking over that part of the evidence he had some recollection of the defendant having had some car work done at his place or garage, and he went to his books more to

satisfy his own mind than anything else, or words to that effect, and found from his books that the defendant had had some car work done in his garage on the 24th day of April, 1929, but he did not mention that fact to the jury or any member, so far as this affiant knows, and did not mention that fact to this affiant, before the verdict had been agreed upon."

It needs no dissertation on the proper conduct of jurors to show that the incident just narrated was a serious breach of it. To palliate such misconduct, the state stresses the point that juror Arbuthnot did not reveal what he had discovered in his business records to his fellow jurors until after they had reached their verdict. So far, so good; but Arbuthnot himself took into consideration the data shown by his files in making up his own mind about the guilt of defendant. There could be no verdict until Arbuthnot concurred in it—until he was convinced of defendant's guilt from the evidence he had heard on the witness stand. If defendant was confined to his home with the measles during the latter half of April and the first half of May, and eight or ten witnesses swore such was the fact, he had not committed the crime charged in his automobile in front of the home of the prosecutrix in Marysville. With such an array of witnesses in defendant's favor, juror Arbuthnot "wondered about it," and undertook this extrajudicial method of settling the question in his own mind. Cases are cited where jurors' statements of personal knowledge of facts concerning matters in issue have been held nonprejudicial, but none of them constituted so flagrant a case of misconduct as the one here presented. The consequence is that the judgment must be reversed and the cause remanded for a new trial. It is so ordered.

MARSHALL, HARVEY and JOCHEMS, JJ., concur in the result, but hold that the book and writings of the prosecutrix should have been admitted in evidence. Mr. Justice HARVEY also holds that the state's election was too indefinite.