No. 29,671.

THE STATE OF KANSAS, ex rel. GERTRUDE L. EMERY, *Appellant,* v. CHRIS CHRISTENSEN, *Appellee.*

(294 Pac. 892.)

Opinion filed January 10, 1931.

*J. P. Noble,* of Oberlin, and *H. L. Lehman,* of Trenton, Neb., for the appellant.

*Herbert Howland* and *C. A. P. Falconer,* both of Atwood, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was a prosecution for bastardy under the statute, R. S. 62-2301 *et seq.*

On October 14, 1928, Gertrude L. Emery, an unmarried woman, twenty-one years of age, resident of Rawlins county, was delivered of a bastard child, and on January 14, 1929, she made a verified complaint before a justice of the peace in Atwood township, Rawlins county, charging that the defendant, Chris Christensen, was the child's father.

The justice of the peace held a preliminary inquiry and required the defendant to enter into a recognizance with sureties for his appearance at the next term of the Rawlins county district court.

In due time the cause came on for trial before a jury. It was developed that for some time prior to 1925 the relatrix and her family lived at or near Stratton, Neb., a few miles across the state line, north of Rawlins county. A widower, John Wilkinson, had a farm twenty-two miles northwest of Atwood. The defendant Christensen and his wife lived on a neighboring farm a mile or two away. In 1925 the mother of the relatrix married Wilkinson. In 1926 the wife of defendant Christensen died, and not long afterwards the relatrix came from Nebraska to make her home with her mother. In June, 1927, she and defendant began going together to dances, social gatherings and picture shows.

According to the evidence for the prosecution, a criminal intimacy between relatrix and defendant began in August, 1927, and continued until the middle of January, 1928. The relatrix herself testified to several specific instances of sexual indulgence in which she and defendant engaged, and, indeed, some of these alleged instances were observed by other witnesses, according to the testimony of relatrix and one other witness. The relatrix testified concerning one act of sexual intercourse between herself and defendant which occurred on a by-road as they were returning from a picture show at Stratton about the time in January, 1928, when the illegiti-. mate child must have been begotten. Following that alleged incident the young woman's menses ceased, and, according to her testimony, she apprised defendant of that fact and he said he would marry her and take care of her. The mother learned of her daughter's situation and she had a conversation with defendant:

"I asked him what he was going to do about this and he said, I can't do anything; and I said, well, it is time there was something done, and he said he wasn't guilty, and I told him, you know you are guilty, and he finally told me, I don't think there is anything wrong with the girl. He said, I want you to take her to a doctor and have an examination made and get a doctor's certificate, and I said, yes, I will do anything. So he rather insisted we come to Dr. Linnegar. . . . We came direct to Dr. Linnegar and he made an examination. He said [meaning defendant] when we came back we should stop and he would be there to know the truth, and when we came back we stopped as agreed and he was not there."

The prosecuting witness also testified that in March defendant told her he would go to Bird City and get some medicine, and later when she and he were in his automobile he gave her a bottle and said the doctor told him it was "mighty strong medicine" and would do one of three things—cause a successful abortion, make the unborn child a cripple, or kill herself. She declined to take the medicine.

There was corroborating testimony to support material parts of the state's case against defendant. One witness testified that he and another man and two women discovered defendant and relatrix engaged in sexual intercourse in a Ford coupé in front of the Wilkinson home during the "holidays of 1927."

Testifying in his own behalf, defendant avowed that while he kept company with the prosecutrix from June, 1927, until sometime in 1928, he never had sexual intercourse with her and denied *in toto* all the discrediting incidents to which she and the state's witnesses had testified against him. The evidence in his behalf also tended to show that during the interval when defendant was paying his court to the prosecutrix she kept company with other men; that at social gatherings to which defendant would take her she would disappear with some other fellow for a time. Defendant testified:

"Q. Did you see Gertrude leave the oyster supper that evening? . . . A. Yes. . . . She was gone half an hour, maybe longer. Had a conversation with her about that. . . . I told her I didn't approve her going out with these men . . . as long as I was keeping company with her. That was in January, 1928, New Year's eve.

"Q. Did you go with Gertrude Emery any after that time? If so, when was the next time? A. I believe I had taken her to Stratton to the show one time. About the middle of January, 1928. Just Gertrude and myself. . . .

"Q. Do you remember an occasion of one of the Wilkinson or Emery girls coming up to your place? A. I do. That was in April, 1928. . . . I met Gertrude Emery; was there on the porch. She came out of the car. We talked a little while. She asked me why I didn't come to see her any more, and I told

her that her being out with these men, and them hanging around there, that I did not care to go with her any more."

Another witness testified that at a barn dance during the Christmas holidays in 1927 Gertrude "was kinder reely, she couldn't walk straight."

"A. She didn't stay in the barn long; she went out and left the floor.

"Q. Did any one leave the barn at the time she did? That you know of? A. A few of the men folks, the boys, they left.

"Q. Do you know about how long she would be gone on any of these occasions?

. . . . . . . . . . . . . . . . .

"A. Twenty-eight minutes to half an hour, there was a bunch came back when she came back, four or five men folks, she left about twice."

Another witness testified that in March, 1928, Gertrude told her she had met a fascinating fellow named Frisby.

"Well, I just asked her, aren't you supposed to be going with Chris? She says, yes; but I will step out whenever I get a chance, that is all."

On rebuttal, however, the prosecutrix and other witnesses gave testimony controverting the evidence from which it might be inferred that she was promiscuous in her sexual indulgence.

A matter which doubtless had a potent effect on the verdict was elicited in the cross-examination of the relatrix herself. Over objection of counsel for the prosecution, she had to answer a question which brought out the fact that three years previously, when she was but 17½ years old, she had given birth to another illegitimate child. Over objection, also, a kinswoman of Gertrude's by marriage testified that when defendant's wife died, Gertrude's mother remarked that "Chris would sure be a fine catch for some other girl."

The jury returned a verdict of not guilty, and plaintiff appeals. The principal error complained of relates to the cross-examination of the relatrix touching the fact that she had already given birth to another illegitimate child before the birth of the one which gave rise to the present action. The record reads:

"Q. When do you first say you had sexual intercourse with defendant? A. Latter part of August, 1927, south of Stratton.

"Q. You say you are an unmarried woman? A. Yes.

"Q. Have you ever been married? A. No.

"Q. Was that your first act of intercourse?

"Plaintiff objects as incompetent, immaterial, not within the issue. Sustained.

[COUNSEL FOR DEFENDANT]: "The defendant offers to show on cross-examination of the complaining witness as affecting her credibility as a witness

the fact that she was confined in the city of Hastings, Neb., on June 6, 1925, and there gave birth to a male child and that prior to that birth and after the birth she made demand on one Ralph Sarver for a settlement and stated to him that if he did not settle, they would have him arrested for intercourse obtained under the promise of marriage in action to support the child.

"The plaintiff objects as incompetent, irrelevant and immaterial and not within the issue and not proper cross-examination. Does not tend to prove or disprove any issue in the case.

"THE COURT: Is this cross-examination being offered for any other purpose than to go to the credibility of this witness?

[COUNSEL FOR DEFENDANT:] "No, that is the purpose of it.

[COUNSEL FOR PLAINTIFF:] "If it went in for that, the jury would consider it for all purposes.

[ASSOCIATE COUNSEL FOR PLAINTIFF:] "It is entirely without issue because there was no issue in the proceedings."

At first the court ruled against the admissibility of this evidence, but later, after argument in the absence of the jury, the court held that it was admissible but its significance would be restricted in the instructions. The record then proceeds:

"Q. During that month were you delivered of a baby? In the month of June, 1925, in Hastings?

"Plaintiff objects as incompetent, irrelevant and immaterial, not proper cross-examination.

"THE COURT: Counsel for defense announces in a statement to the court that the only purpose for which they desire this testimony is in so far as it may affect the credibility and veracity of the witness. The court will allow the witness to answer for that purpose and that purpose only and it should be considered by the jury for that purpose only. A. Yes, sir.

"Q. You have never been married? A. No.

"Q. About what age were you when you began indulging in sexual intercourse with men and boys?

"Plaintiff objects as incompetent.

"Sustained."

On this matter the trial court gave the jury this instruction:

"8. On cross-examination of the relatrix, the court permitted testimony or evidence to be received to the effect that the relatrix gave birth to an illegitimate child about June, 1925. You are instructed that such testimony was permitted to be offered for the sole and only purpose of affecting, if you find it does affect, the veracity and credibility of the relatrix, and you may consider it for that purpose alone and for no other purpose. If you find and believe from a preponderance of all the facts, evidence and circumstances in this case that the defendant is the father of the child born to the relatrix on the 14th day of October, 1928, then in that event, it is no defense to the defendant that the relatrix gave birth to an illegitimate child prior to that date."

This court can readily appreciate how greatly the testimony given by the relatrix on cross-examination weakened the case for the prosecution. Yet in an action for the support of a bastard child whose paternity must largely depend upon the testimony of the relatrix herself, and particularly upon the credence to which her testimony may be entitled, this court is not prepared to say that the fact that she had already had another bastard child by another man three years previously ought to have been kept entirely away from the jury. On cross-examination, a witness in a bastardy case, indeed in any case, may be required to answer questions on collateral matters which may tend to discredit her veracity. Questions concerning the latitude permitted in cross-examining witnesses most frequently arise in criminal cases. In a prosecution for statutory rape (*State v. Abbott*, 65 Kan. 139, 69 Pac. 160), the mother of the girl served as prosecuting witness. The accused offered to show on cross-examination that she herself had been criminally intimate with defendant, and that the prosecution was brought to appease her husband and to extort blackmail from the accused. The trial court would not permit such cross-examination. But this court held that such ruling was erroneous. In the opinion it was said:

"It was competent for the defendant to cross-examine the witness as to her antecedents, character, and past conduct, and thus impair her credibility. This line of inquiry became important because of the contention that the prosecution was prompted by the malice of this witness, resulting from a failure to extort money, and some of the circumstances surrounding the case seem to justify a full cross-examination as to her past conduct and character. There is no better method of sifting the conscience and testing the veracity and credibility of a witness than by cross-examination, and there is abundant authority holding that for the purpose of impairing the credibility of the witness he may be cross-examined as to specific acts tending to discredit him, although such acts are irrelevant and collateral to the main issue. (Citing cases)." (p. 141.)

In *State v. Smith*, 114 Kan. 186, 217 Pac. 307, where defendants were convicted of robbery, complaint was made about the extent of the inquiry permitted on the cross-examination of a witness for defendants. This court said:

"The purpose, of course, was an attempt to discredit the testimony of the witness. It has been repeatedly held that the extent to which a witness may be cross-examined is largely in the discretion of the trial court, and that, unless prejudice is shown, or, that the court abused its discretion, there will be no reversal. On cross-examination a witness may be interrogated concern-

ing his past conduct and character and as to specific acts which tend to discredit him for the purpose of impairing his credibility, although such acts may be irrelevant and collateral to the principal controversy in the case." (p. 187.)

Later cases sustaining the same general rule are: *State v. Waldron,* 118 Kan. 641, 236 Pac. 855; *State v. Nossaman,* 120 Kan. 177, 243 Pac. 326. See, also, *State v. Gibson,* 131 Kan. 570, 290 Pac. 931.

This rule is essentially the same in civil cases. (*Schuster, Tootle & Co. v. Stout & Wingert,* 30 Kan. 529, 2 Pac. 642; *Ramsey v. Partridge,* 86 Kan. 398, 121 Pac. 343; *Cockrell v. Railway Co.,* 90 Kan. 650, 136 Pac. 322; *Harmon v. Theater Co.,* 111 Kan. 252, 206 Pac. 875; *McMillan v. Carlton,* 121 Kan. 797, 250 Pac. 308.)

See, also, note on cross-examination as to sexual morality for purpose of affecting credibility of witnesses in 65 A. L. R. 410-426; 28 R. C. L. 602, 607, 611; 40 Cyc. 2480-2488.

The second assignment of error suggests that the preponderance of evidence was in favor of plaintiff, and that there was no evidence to support the verdict "except that of defendant which was shrouded in mystery." That point, however, is not within the scope of appellate review. The main trouble with this case is that the jury did not believe the testimony adduced by the relatrix, and this court has no corrective for such an *impasse.* In *State, ex rel., v. Creager,* 97 Kan. 334, 155 Pac. 29, which was an appeal from a verdict and judgment of acquittal in a bastardy case, this court held:

"In an action for bastardy evidence may properly be received that near the probable date of conception the relatrix associated with a young man other than the defendant under circumstances which offered as much opportunity and as much likelihood of improper conduct with him as with the defendant." (Syl. ¶ 2.)

It is indeed regrettable that hitherto the paternity of the misbegotten child concerned in this action has not yet been fastened on whatsoever man is morally and legally bound to support it, but the error assigned against the verdict cannot be sustained.

Appellant next complains of the 6th instruction, which reads:

"Some testimony has been received as to statements and demands made by the mother of the prosecutrix. This testimony may be considered by you only for the purpose of determining whether or not this action has been brought in good faith or whether there is an ulterior motive, design or scheme on the part of the prosecutrix and her mother to wrongly charge the de-

fendant with being the father of the prosecutrix' illegitimate child, and you can consider such testimony for no other purpose."

The mother of the prosecutrix was an important witness for the plaintiff and the record shows that she made a number of demands on the defendant and one on the defendant and his brother that the defendant marry her daughter. In making his defense defendant produced a witness who testified that at the time the defendant's wife died and before her funeral had been held that Mrs. John Wilkinson told her that the defendant would sure be a "fine catch" for some other girl. This testimony may have had a slight bearing upon the mother's testimony as showing her interest in the case and whether or not she had an ulterior motive in accusing the defendant of being the father of her daughter's child and making demand upon him that he marry her. Such testimony was not inadmissible and the criticized instruction was proper and within the range of inquiry before the jury for consideration.

A careful review of this case discloses nothing approaching the gravity of reversible error, and the judgment is therefore affirmed.