Macmillan v. Carlton.

No. 26,792.

MAURINE (MARIE) MACMILLAN, *Appellee*, v. GUY F. CARLTON, *Appellant*.

SYLLABUS BY THE COURT.

1. BREACH OF MARRIAGE PROMISE—*Evidence—Sufficiency as Against Demurrer.* In an action for damages for breach of contract to marry, the proceedings considered, and held not error to overrule a demurrer to plaintiff's evidence.

2. SAME—*Evidence—Hereditary Insanity—Probate Transcript.* And further, it was not prejudicial error for the court to reject a transcript of the proceedings of the probate court concerning the insanity of plaintiff's mother, where the records of the asylum covering the same subject matter were introduced and the mother herself (who had recovered) was present at the trial and testified concerning substantially the same matters which could have been shown by the probate records.

3. TRIAL—*Cross-examination—Discretion of Trial Court.* The limits of the cross-examination of an adversary who offers himself as a witness are ordinarily within the sound discretion of the trial court. Reversible error cannot be predicated thereon unless prejudice is shown, or unless the court abused its discretion.

4. BREACH OF MARRIAGE PROMISE—*Instructions.* The instructions considered and held to have been fair to the defendant and to have fairly covered the issues in the case.

5. SAME—*Trial Generally.* Various alleged errors considered and held to be without substantial merit.

Appeal from Crawford district court, division No. 2; GEORGE F. BEEZLEY, judge. Opinion filed November 6, 1926. Affirmed.

*C. S. Denison* and *E. V. Bruce,* both of Pittsburg, for the appellant.

*Ben S. Gaitskill,* of Girard, *T. J. Seehorn, W. R. Barnes* and *S. H. Schwartz,* all of Kansas City, Mo., for the appellee.

The opinion of the court was delivered by

HOPKINS, J.: The action was one for damages for breach of contract to marry. Plaintiff recovered and defendant appeals.

Plaintiff alleged a marriage contract was entered into between the parties at Kansas City, Mo., January 22, 1924, under the terms of which they were to be married within a reasonable time after her return from a trip abroad, not later than June 2, of the same year; that by reason thereof the defendant induced the plaintiff to sur-

Appeal and Error, 4 C. J. pp. 823 n. 63, 968 n. 38, 1011 n. 13. Breach of Marriage Promise, 9 C. J. pp. 323 n. 21, 364 n. 78. Insane Persons, 32 C. J. pp. 594 n. 44, 600 n. 55. Witnesses, pp. 2508 n. 22, 2515 n. 54.

render her position with the Stock Yards National Bank, where she was earning $110 a month; that he had refused to perform the marriage contract. She also alleged that he was a man of wealth, exceeding $200,000.

The defendant alleged that he conditionally promised to consider marrying the plaintiff. The conditions being that if he continued to like the plaintiff in the way he did; if everything worked out all right, and unless something caused him to believe otherwise of her, he would consider marrying her. He also alleged that if any contract or promise to marry the plaintiff was made, it was brought about as the result of a conspiracy entered into by the plaintiff, Laura Belle Seegar, and one Joe Twitts, and in which conspiracy the parties consorted together and agreed to cause the plaintiff to be introduced and socially associated with the defendant, and by artifice, flattery, misrepresentation, coercion and fraud cause the defendant to enter into a marriage contract with the plaintiff, if possible, and if not possible, to establish apparent, but unwarranted, grounds for the plaintiff to sue the defendant for damages for breach of promise, and that said conspirators, in furtherance of such understanding, practiced certain deceptions and concealments, and committed certain wrongs towards the defendant; that plaintiff, and her coconspirators misrepresented the plaintiff's family ties and connections and the state of their health and sturdiness; that the plaintiff and her coconspirators well knew that the plaintiff's mother for a number of years was confined in state hospital No. 2 for insane, at St. Joseph, Mo., for hereditary insanity; that plaintiff's aunt, Ada Wright, was confined in the same hospital for insanity upon four different occasions in fifteen years; that one of plaintiff's aunts, while insane, jumped into a cistern and committed suicide; that one of her uncles, while insane, committed suicide by cutting his throat; that the plaintiff's grandmother was insane, and that there was a streak of hereditary insanity running through the family of plaintiff.

Trial to a jury resulted in a verdict and judgment for plaintiff for $15,666.

There was testimony tending to show these facts:

In May, 1918, the plaintiff's mother, Susie V. Macmillan, made arrangements for plaintiff to board and room with Laura Belle Seegar, whose parents-in-law were neighbors of the Macmillans at Weston, Mo., where plaintiff first met and became acquainted

with Mrs. Seegar. At that time Mrs. Seegar lived with her mother in Kansas City, Mo. After coming to Kansas City, plaintiff lived with Mrs. Seegar. She worked for Montgomery Ward & Company, and for the Metropolitan Life Insurance Company, and later, through the influence of Mrs. Seegar, obtained employment at the Stock Yards National Bank. In 1921 Mrs. Seegar and Joseph Fitzgerald were married. The plaintiff lived with them. The plaintiff first met the defendant in the office of the Dixon Commission Company, at the Stock Yards, about August, 1923. She was introduced to him by Mrs. Seegar, who was connected with the Dixon Company. About three weeks thereafter, defendant was again in the city, and invited plaintiff and Mrs. Seegar to have lunch with him, which they did. (Mrs. Seegar, after her marriage to Fitzgerald, continued to use the name of Laura Belle Seegar in her business transactions at the Stock Yards.) There was testimony that defendant then asked permission to call upon plaintiff at her home, but the request was denied because he was a married man. He was told that it would be all right after he was divorced. This the defendant denies, contending that plaintiff and Mrs. Seegar wanted him to go out to their home and that he declined, but did go with them to dinner. On December 6, 1923, defendant told plaintiff that his wife had obtained a divorce from him, and again asked permission to call at her home. It appears that after that date defendant ardently courted the plaintiff. He called upon her every time he came to town, and every night while he was in town. They attended shows together, and went to dinner together. During such times he assured her of his love for her. He presented her with a platinum wrist watch as a Christmas present. From December 2, 1923, until March 26, 1924, he frequently wrote to her expressing his love and affection.

The defendant contends that there was hereditary insanity running through plaintiff's family which it was her duty to reveal to him; that her testimony on cross-examination showed that she had not done so, for which reason a demurrer to her evidence should have been sustained. The plaintiff, on the other hand, contends that insanity is not necessarily hereditary, and that whether or not plaintiff, under all the circumstances, should have apprised defendant of insanity in her family was a question of fact.

Insanity is not necessarily hereditary. Many forms are merely temporary and personal, while other forms are recognized as permanent and hereditary. (See Wharton & Stillé's Mental Unsoundness,

§ 580, *et seq.;* 1 Wigmore on Evidence, § 232; 1 Greenleaf on Evidence, 16 ed., § 42; 2 Greenleaf on Evidence, 16 ed., § 689; *Johnson v. Me. and New Bruns. Ins. Co.,* 83 Me. 182; *Gridley v. Ins. Co.,* 11 Fed. Cas. [No. 5808] 2; *Von de Veld v. Judy,* 143 Mo. 348, 364.)

The defendant contends that the court erred in refusing to admit evidence in the form of a certified transcript of the proceedings of the probate court of Platte county, Missouri, concerning the insanity of plaintiff's mother. It appears, however, that the defendant immediately followed his rejected offer by introducing the records of the asylum in reference to the same subject matter, which included the same information together with a vast amount of data relative thereto. In addition to this, plaintiff's mother was present at the trial and testified, admitting perhaps everything that could have been shown by the probate records. Under the circumstances the defendant was not prejudiced by the court's action in excluding the transcript.

The defendant complains of what he terms an unwarranted cross-examination relative to letters written by him to the plaintiff. He argues that, "It was admitted that he wrote the letters," and did not deny anything in them; that "the admission was made in order to prevent a burdensome record, and for the purpose of expediting the lawsuit, and for the further purpose of waiving any identity of the letters and the contents thereof;" that, notwithstanding the admission, "the court permitted counsel for plaintiff to sit back at long distance and ambush the witness with ridiculous and silly questions, for the purpose of trying to ridicule and embarrass the defendant, instead of getting the real facts before the jury." The cross-examination elicited, among other things, the following:

"I saw them (plaintiff and Mrs. Seegar) about the 1st day of December. I might have been up there the 2d, 3d or 4th of December. When I went up, I saw Laura first, at the Dixon Commission Company's office. Laura had a clipping from a newspaper. She knew I had been granted a divorce. In my letter of December 2d, I called plaintiff 'Dearest Marie.' I had feeling for her, and I told her I loved her. I thought she was a fine girl, and was in earnest about it. I meant what I said in my letter of January 13, that 'I love you the best of all.' . . . I thought she was one of the dearest girls to be found anywhere on earth. . . . I meant what I said in telling her that 'I think more of you all the time and I hope things will work out for me so that we can take a fine trip in June.' . . . I meant what I said in my letter of January 19, 1924, when I said, 'I cannot tell you how much I think of you, you have taught me to love you, and I know that I always will.' . . . If everything turned out all right I intended to be married and make her my wife. I

Macmillan v. Carlton.

didn't want her to go on a trip with me without being married. If I took her away, I was going to live with her as man and wife, not as man and woman."

Some portions of defendant's testimony on cross-examination appear to have been material and quite pertinent to the issues in controversy.

Where a party takes the stand as a witness in his own behalf, his adversary has a right, on cross-examination, for the purpose of affecting his credibility, to inquire touching his past life and conduct, the limits of such inquiry, ordinarily, being within the discretion of the trial court. (*State v. Shanahan,* 114 Kan. 212, 217 Pac. 309, and cases cited.) We are unable to say that the defendant was prejudiced by the cross-examination permitted or that there was an abuse of discretion by the trial court which would warrant a reversal.

The defendant complains of instructions given by the court touching the question of insanity in plaintiff's family; also an instruction to the effect that if the jury found certain allegations of defendant's answers were not made in good faith, but out of mere spite and ill-will for the purpose of injuring the reputation of the plaintiff, they might consider such facts in aggravation of plaintiff's damages, should they find a verdict in her favor.

We do not deem it necessary to set out or analyze the instructions in detail. Those on insanity were substantially to the effect that insanity is of different forms and may or may not be hereditary, and whether, in a given case, it is hereditary is a question of fact to be ascertained. The instructions given were not unfair to the defendant. The court, at the defendant's request, set out at considerable length the allegations of the defendant's answer covering concealment, conspiracy and fraud on the part of the plaintiff and her associates. The court also gave various other instructions on defendant's theory of the controversy based on such allegations.

We are of the opinion that the instructions going to the good faith of the allegations of defendant's answer were, under all the circumstances, not prejudicial. (*Liese v. Meyer,* 143 Mo. 561, 562; *Thorn v. Knapp,* 42 N. Y. 474.)

Considering all of the instructions together, we are unable to say that they did not fairly cover the issues in the controversy. Other alleged errors have been considered. We find none which would warrant a reversal.

The judgment is affirmed.